Fabacher vs. Bryant & Mather.

## No. 11,387.

### PETER FABACHER VS. BRYANT & MATHER.

Courts will not adjust a controversy arising out of the illegal purpose and attempt of a Draymen's Association to deprive the presses of this city of the right to choose the labor required for hauling cotton, the association proposing to accomplish this by passing a tariff of charges for hauling, designating their members to do the hauling, and subscribing money to prevent the presses from obtaining any labor except that furnished by the association, to be paid according to their tariff, and the testimony showing that the purpose was made effective by the money put up by the association and other methods by which non-union men were compelled to abandon the service of the presses. Civil Code, Arts. 1893, 1895; India Association vs. Kock, 14 An. 118; Gravier vs. Carraby, 17 La. 142, and cases collected in 2d Hennen's Digest, 1007, No. 1.

The court in aid of public policy and the law will notice irrespective of the pleadings that the controversy submitted for adjudication grows out of illegal purposes or combinations, and that illegality manifested by the record, it is obligatory on the court to dismiss the suit. *Ibid.*

APPEAL from the Civil District Court, Parish of Orleans.
　　*Monroe, J.*

*Lazarus, Moore & Luce* Attorneys for Plaintiffs and Appellants:

Bryant & Mather refused to carry out in good faith the contract into which they had entered, and because of the violation of said contract by them, Fabacher, in consequence thereof, sustained damages which are fully and specifically set out in the petition, and are as amply sustained by the evidence.

As an excuse for this gross breach of their contract, Bryant & Mather, admitting that Peter Fabacher was given the contract to do the hauling as set out in his petition, say that they entered into this contract with Fabacher upon the supposition and representation of said Fabacher that he had been assigned to do the hauling by the Draymen's Association, but that subsequently they discovered that Fabacher had not been selected by the said association to do their hauling, but that one Thomas Egan, Jr., had been; that, thereupon, they withdrew from their contract with Fabacher and gave their hauling to said Egan, who defendants allege had truly been selected by the Draymen's Association to do the hauling of cotton for the Louisiana Press.

Fabacher vs. Bryant & Mather.

They further contend that Peter Fabacher never had been selected by the Draymen's Association to do the hauling, and that any representation or pretext on his part that he had been is absolutely untrue and unfounded; and that, on the contrary, the minutes of the association show that Thomas Egan, Jr., had been allotted to do the hauling of the said press on August 6, 1891, and by reason of this allotment and the false representations of said Fabacher they had canceled and withdrawn the contract they had made with said Fabacher.

They go on further and set up that Egan guaranteed to hold them harmless in the premises if they would withdraw their contract from Fabacher, and to pay and reimburse them all such damage, counsel fees, etc., which they may sustain in the event of the court holding them liable in damages for breach of their contract with Fabacher; and they call said Thomas Egan, Jr., in warranty.

The answer of Egan, the warrantor, is substantially the same as that of Bryant & Mather. He denies that Fabacher ever was selected by the Draymen's Association to do the inhauling of the press. He admits that he (Egan) was selected for such hauling by the association, and joins Bryant & Mather in their general averments against Fabacher.

———

*E. D. Saunders, E. W. Huntington* and *H. L. Dufour* Attorneys for Defendants and Warrantor, Appellees:

Bryant & Mather were under compulsion, in order to carry on their business, to take such draymen as were assigned them by the Draymen's Association.

They first made a contract with Egan, a member of that association.

Then Fabacher came to their office, introduced himself and declared that the association had assigned him their work. Believing this representation to be true they gave him an order on carriers for their cotton.

Neither Bryant & Mather nor Fabacher said a word as to the rate at which the hauling was to be done.

Egan next turns up and denies that the association had assigned the work to Fabacher.

For two or three weeks all parties, Bryant & Mather, Fabacher and Egan, are appealing to the association to decide to whom it had assigned the work.

The final decision of the association was in favor of Egan and against Fabacher.

There was no contract between Bryant & Mather and Fabacher.

(a) Because the sole representation by which he obtained the order on the carriers, viz.: his statement that his association had assigned him the work, was eventually declared to be untrue by the association itself.

(b) Because there was no agreement as to one of the essential elements of the contract of hiring, viz.: the price at which the work was to be done.   The order on the carriers did not fix the price, and nothing was said on that subject by either party.

No damages recoverable even if there were a contract:

(a) Because it was Fabacher's duty to sell the mules promptly, and so diminish the loss; instead of which he kept them several months, said nothing to defendants, let the best season for selling pass, and sold at the worst season.

(b) Because it is not shown, even by plaintiff's own witnesses, that Fabacher would have made any profit if he had kept the contract.

----

The opinion of the court was delivered by

MILLER, J.   The plaintiff, engaged in the business of hauling cotton for the presses in this city, alleges he was employed by defendants, proprietors of the Louisiana Cotton Press, to do what is termed the inhauling of cotton for that press for the seasons of 1891-92. The petition alleges the breach of the contract and claims large damages.   The answer of the defendants is, in effect, that at the period of the alleged contract there was no option for the presses of this city in respect to the employment of draymen, but they had to engage those designated by the Draymen's Association; that accordingly they contracted with Thomas Egan, a member of the association, that later the plaintiff called on defendants, announced himself as the choice of the association, and under that representation they were led to give him an order for cotton intended for their press, but the representation, the answer avers, was untrue; that, in fact, Egan, with whom they had already contracted, had been

selected by the association, and he claimed his rights, which defendants recognized. That defendants, alleging that Egan was bound to defend them against the demand in the petition, called him in warranty. The warrantor answered, averring his selection by the association, his rights under his contract with defendants, and controverting the plaintiff's demand. The case was submitted to a jury; the verdict was for plaintiff, but on the new trial granted by the court judgment was rendered in favor of defendants, and plaintiff appealed. The record of over seven hundred pages teems with exceptions to the testimony and ruling of the lower court, but the case as presented to this court submits the issue for our determination without reference to the exceptions.

It is in evidence that the Associated Draymen of the city, in the cotton season of 1891–92, adopted a tariff of charges for hauling cotton, and undertook to distribute among the members of the association the hauling of the various presses. In the theory of this association, the presses were to be consulted neither in reference to the price to be paid or as to those who should do the hauling. It is claimed, however, that in all this the association contemplated no compulsion whatever to be exerted on the presses. The weight due to this disclaimer of compulsion is well illustrated by the record. It is established that, not content with organizing the labor of the city on a tariff of charges and assigning to the various presses the draymen to be employed by them, the members of the association subscribed money to put it beyond the power of the presses to employ any other than association or union men. The precise method in which it was proposed to use the money is not disclosed by the record. Whether to keep union men from working in the presses until the draymen's tariff of charges was accepted, or to deter non-union men from that service, the effect was the presses were utterly unable to obtain any labor except that prescribed by the association, to be paid the prices exacted by the tariff. Any exertion of choice by the presses in respect to the labor required for hauling resulted in non-union men being driven from their drays. The defendants had exercised their supposed right of choosing their labor, and their choice had fallen on non-union men. But after a struggle of a few days the men selected by the defendants were compelled to leave their employment. In the language of the president of the association, testifying in this case, the non-union men "quit." The methods that

made them "quit" were, to say the least, not pacific. In the letter we find in the record of the plaintiff, he congratulates the association on its success over the non-union men who for a few days of hopeless effort attempted to dray for defendants. The officers of the association who testify, strenuously disclaim violence, as not within the scope of the association. An organization with its tariff of charges and allotment of members, to be accepted by the presses, makes, we think, a large advance toward promoting violence, when it puts up money to prevent the employment of any except its members, and this tendency of the measures of the association, we think, finds illustration in the record. Other methods serve as effectively as the money, the subscription of which is avowed, and, it is our conclusion, were employed.

In the condition existing in this city in the beginning of the cotton season of 1891-92, the defendants found themselves with no alternative in respect to the labor needed for the hauling of cotton. It was union men at tariff prices or no labor. The defendants acted on the theory that at least they would be permitted to choose a union man, and accordingly selected Egan, the warrantor in this case, who claimed the Louisiana press had been assigned to him by the association. Hardly had this contract with Egan been closed, when the plaintiff Fabacher presented himself with the claim he, and not Egan, had been chosen by the association. The plaintiff testifies it was not his purpose to force himself on defendants. There was, however, in his intercourse with defendants no discussion or preliminaries usual to the making of contracts when the parties occupy equal positions. The defendants recognized the potency of the selection of the plaintiff by the association stated by the plaintiff, and on the faith of that representation gave plaintiff an order for the delivery of the cotton intended for their press. It is this order the plaintiff deems his contract. Here the defendant supposed the trouble ended. They had under pressure discarded the non-union labor previously secured; they had next engaged Egan, a union man, and because he was a member of the all-powerful association, and now at the requirement of the association, as they supposed, they employed Fabacher. But Egan clung to his contract, strenuously denied that Fabacher had been selected, and notified defendants he would hold them for damages if they undertook to withdraw from him the hauling. Thus the unfortunate defendants practically, with no control over

their contract, were involved from no fault of their own in the contention between two members of the association whether one or the other had been chosen to do the work of the press. The defendants in urgent need of labor, with no opportunity of obtaining it except from the association, and compelled to exercise their judgment between the two contestants, determined Egan had the better claim of recognition by the association gave him their order for all cotton intended for the Louisiana press. The result is this suit by plaintiff.

It is claimed the court is called on to determine the issue whether plaintiff had any contract with defendant and to annul damages if the contract exists and has been violated by defendant. In our appreciation there is another question forced on our attention by this record. The court is practically called on to find whether Egan or plaintiff was chosen by the association, and when that issue is determined to give effect to the actions of the association prescribing to defendants the employment of one or the other of these contestants. For plaintiff's asserted employment rests on his representation of selection by the association, and if there was no basis for that representation there is no ground for plaintiff to complain that defendants gave their hauling to Egan. All the parties accept that this issue of the choice of the association is that to be solved by this court, and to that end the minutes of the association and copious testimony of its proceedings undertaking to prescribe the persons, members of the association, to do the hauling for the presses of the city, have been put in evidence and discussed at the bar. It is the right of the members of the association to establish their tariff of charges and decline service unless on their terms. But when the association goes beyond this, and undertakes by subscriptions of money, or other means, to prevent the presses of this city from obtaining any labor for hauling cotton except, that furnished by the association, that purpose of the association is plainly repugnant to public policy and the law. It was in aid of and an essential part of that illegal purpose that the association designated its member, whether one or the other of the contestants, to do the hauling of the Louisiana press. It is said this designation was, after all, a mere recommendation. This argument supposes the presses were unable or unwilling to select the required labor, and referred that selection to the association. The so-called recommendation should bear another name. It carried the significance, accept the recommenda-

tion or no labor will be attainable, and the power and machinery of the association it is manifest, from this record, were competent to enforce that significance. How was it until all had been made to realize the potency in this respect of the association, that the defendants yielded all choice? The non-union men originally selected by them were denied admission as union men, compelled to abandon their drays, and the letter of the plaintiff himself exults in this triumph over defendants' rights. It is clearly, in the prosecution of the unlawful purpose of preventing defendants from procuring labor of their choice and compelling the employment of union men designated by the association, that the issue in this cause arises, to be solved by an examination of the proceedings of the association and when thus ascertained this court is expected to enforce. If Fabacher is adjudged to have been the choice of the association, his asserted contract is to be maintained and defendants mulcted in damages. If Egan is found to have been more fortunate in the deliberations of this body, then defendant's contract with him is to be permitted to stand. The designation of either is linked to an illegal purpose in aid of which there is on the plainest principles no appeal to the courts. It is trite in our jurisprudence that contentions originating in unlawful purposes are not to be brought into courts of justice. It is obligatory on the court to take notice, irrespective of the pleadings, of the phase of this controversy under discussion and conspicuous in this record. It is deemed appropriate on this occasion to convey the instruction that a controversy of this character can find no adjustment here, but the parties will be left as they stand.. Civil Code, Arts. 1893, 1895; India Association vs. Kock, 14 An. 168; Gravier vs. Carraby, 17 La. 142, and cases collected in 2d Hennen's Digest, p. 1007, No. 1.

Our learned brother of the lower court was in some doubt whether duress as a defence was pleaded. He finally left it to the jury as an issue to be determined. He was right in this. The jury, notwithstanding his charge, gave plaintiff a verdict. That the lower court set aside and dismissed the suit fully warranted, we think, by the record.

It may be added that the motive or consideration for the contract asserted by plaintiff, arising as it did from the representation that he had been selected by the association, the import of that representation was practically that the association had definitely settled

for defendants the party they should employ. In point of fact, there had been no such settlement. There were meetings after plaintiff's representation to determine the question. The fortunes of the contestants fluctuated, as one or the other had friends at these meetings. Egan claimed selection in August. Plaintiff asserted his selection in September. Plaintiff maintained his ground at three meetings, but the contention went on. The defendants had no access to the meetings, nor voice nor part in their deliberations, to determine who should do their work. This suit affirms they are to suffer because of the uncertainty in the councils of the association. If they yielded to plaintiff they were menaced with Egan's suit. Assured by Egan he had been chosen, and abiding by their contract with him, they are subjected to this suit. But at the final meetings of the association on the 1st and 12th of October the choice of the association was declared to rest on Egan.

If there were no other ground, we think this final action should have relieved the defendants from this suit on an asserted contract, the assent to which, if assent it can be called, rested on the plaintiff's representation that he had been chosen, not verified by the action of the association whose choice of himself he had undertaken to affirm.

It is therefore ordered, adjudged and decreed that the judgment of the lower court be affirmed, at the costs of the appellant.