(71 South. 137)

Nos. 21743, 21745.

STATE v. AMERICAN SUGAR REFIN-
ING CO.

(Jan. 26, 1916. Rehearing Denied in No. 21743,
March 6, 1916.)

*(Syllabus by the Court.)*

1. PLEADING  ⬥48 — "PETITION" — REQUI-
SITES.

A "petition" is a written document which the plaintiff addresses to a competent judge, setting forth the cause of the action which he intends to bring against the defendant, and praying to be permitted to cite that defendant before him, in order that he may be ordered to do or to give a certain thing. It must contain a clear and concise statement of the object of the demand, as well as the nature of the title, or the cause of action on which it is founded.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 105, 106; Dec. Dig. ⬥48.

For other definitions, see Words and Phrases, First and Second Series, Petition.]

2. CORPORATIONS  ⬥370(1) — CONDUCT OF
BUSINESS—CONSTITUTIONAL LAW.

Corporations must conduct their business in such manner as not to infringe the equal rights of individuals or the general well-being of the state.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1511–1513, 1516; Dec. Dig. ⬥370(1).]

3. CORPORATIONS  ⬥651—FOREIGN CORPORA-
TIONS—REVOCATION OF LICENSE—RIGHT.

Where a foreign corporation commits acts which are forbidden by its charter or by a general rule of law, and that act is dangerous to the public, it may be sufficient ground for the state to ask for a revocation of license to do business within the state.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2574, 2575; Dec. Dig. ⬥651.]

4. CONTRACTS  ⬥103—VALIDITY.

The cause (of contract) is unlawful when it is forbidden by law, when it is contra bonos mores, or to public order.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 468–476; Dec. Dig. ⬥103.]

5. MONOPOLIES  ⬥1—DEFENSES.

Monopoly is defined to be: "A license or privilege allowed by the King for the sole buy-

ing and selling, making, working, or using, of anything whatsoever, whereby the subject in general is restrained from that liberty of manufacturing or trading which he had before."

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 1; Dec. Dig. ⬥1.

For other definitions, see Words and Phrases, First and Second Series, Monopoly.]

6. CORPORATIONS  ⬥613(1) — PROCEEDINGS
AGAINST — DISSOLUTION — OUSTER — PAR-
TIES—ATTORNEYS.

The state is a necessary party to a proceeding against a corporation either for its dissolution or for ouster; and the Attorney General or district attorney is the proper officer to institute proceedings.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2431–2434; Dec. Dig. ⬥613(1).]

7. CORPORATIONS  ⬥613(1) — PROCEEDINGS
AGAINST — DISSOLUTION — OUSTER — PAR-
TIES—ATTORNEYS.

"All combinations, trusts, or conspiracies in restraint of trade or commerce, and all monopolies or combinations to monopolize trade or commerce, are hereby prohibited in the state of Louisiana, and it shall be the duty of the Attorney General, of his own motion, or any district attorney of the state, when so directed by the Governor or the Attorney General, to enforce this provision, by injunction or other legal proceedings, in the name of the state of Louisiana, and particularly by suits for the forfeiture of the charters of offending corporations, incorporated under the laws of the state of Louisiana, and for the ouster from the state of foreign corporations: Provided, however, that nothing herein contained shall prevent the Legislature from providing additional remedies for the enforcement of this article. The provisions of this article are self-operative."

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2431–2434; Dec. Dig. ⬥613(1).]

8. FORFEITURE OF CORPORATE CHARTER.

The Civil Code provides in article 447 that corporations legally established may be dissolved "by the forfeiture of their charter, when the corporation abuses its privileges, or refuses to accomplish the conditions on which such privileges were granted, in which case the corporation becomes extinct by the effect of the violation of the conditions of the act of incorporation."

9. STATUTES  ⬥118(2)—TITLE AND SUBJECT-
MATTER.

"Every law enacted by the General Assembly shall embrace but one object, and that shall be expressed in its title." Const. art. 31.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 158; Dec. Dig. ⬥118(2).]

10. STATUTES  ⬥211—CONSTRUCTION — TITLE
AND SUBJECT-MATTER.

Where the title refers to unlawful acts, and the body of the act leaves out the word "unlaw-

ful," the whole act will be construed to refer to unlawful acts.

[Ed. Note.—For other cases, see Statutes, Dec. Dig. ☞211.]

11. INDICTMENT AND INFORMATION ☞2(4)— ANTI-TRUST ACTS—MISDEMEANOR.

The anti-trust acts of the state define a misdemeanor.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 7, 8; Dec. Dig. ☞2(4).]

12. MONOPOLIES ☞24(1) — INJUNCTION AGAINST UNLAWFUL RESTRAINT—RIGHT TO ISSUANCE.

Authority given in an act of the Legislature to issue a preliminary injunction to protect trade and commerce against unlawful restraint, etc., when it is shown to the satisfaction of the court that a defendant has violated the provisions of the statute, does not give countenance to the assumption that the Legislature intended that the courts should issue an injunction of such a general character as would be violative of the most elementary principles of justice, and deprive a defendant of his property rights without a hearing before the court.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. ☞24(1).]

13. MONOPOLIES ☞24(1) — INJUNCTION — RIGHT—ANTI-TRUST LAWS.

The anti-trust legislation of the state provides for the issuance of a preliminary injunction to prevent any and all illegal acts charged against a defendant when he is a party to an illegal combination in restraint of trade, but not to prevent the doing of all business by the defendant.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. ☞24(1).]

Appeal from Civil District Court, Parish of Orleans; Fred D. King, Judge.

Actions by the State against the American Sugar Refining Company. From a judgment overruling its exceptions to plaintiff's original and supplemental petitions, and denying its motion to strike from the petitions certain records, documents, and letters, defendant appeals, and from a judgment dismissing the rule taken by plaintiff for writs of injunction and sequestration and for the appointment of a receiver, plaintiff appeals. Modified and affirmed.

See, also, 137 La. 407, 68 South. 742.

R. G. Pleasant, Atty. Gen., Harry Gamble, Asst. Atty. Gen., and Donelson Caffery, Associate Counsel, of New Orleans (Daniel Wendling, of New Orleans, of counsel), for the State. Joseph W. Carroll, George Denegre, and Hugh C. Cage, all of New Orleans (James M. Beck, of New York City, of counsel), for defendant.

SOMMERVILLE, J. This suit of the state is brought under the anti-trust laws of the state, and was filed July 10, 1915. It is alleged in the petition that the defendant is a New Jersey corporation, with a domicile in the city of New Orleans. It is charged that the defendant corporation is a result of a combination and conspiracy, and that it has combined and conspired with other organizations to operate as a trust in restraint of trade in the state of Louisiana, in violation of the laws of this state, that it is engaged in the lawful business of buying, selling, and refining sugar, but that its business is operated in an unlawful manner. In the petition there is traced the history of the defendant company and its alleged illegal practices from the time of its formation, showing how, through its efforts, the price of raw and refined sugar, an important industry of this state, has been illegally controlled. It further shows that the defendant company controls nearly all of the sugar refineries in the United States and the interstate and foreign trade, commerce, and business in sugar in the United States, and that it holds an unlawful monopoly thereof. It is alleged that the defendant company, as it exists, was organized in January, 1891. The petition further charges defendant with having attempted to restrict legislation in this state.

The petition charges specifically that the combination, consolidation, and purchases of some competing companies, and of stock in others, and other acts mentioned therein, by the defendant company and its predecessors,

were done with the object and purpose of monopolizing, or combining, or attempting to monopolize, and of restraining intrastate and interstate commerce and foreign trade in sugar, and that through the illegal acts of defendant there is little or no competition in the business of importing and buying raw sugars and in the refining thereof; that the defendant's object and purpose were to depress the price of raw sugar, and that it conspired to unduly depress the price of raw sugars for speculative purposes within the state of Louisiana, and of unduly enhancing the price of refined sugar for speculative purposes within the state, and of engrossing unto itself all of the business therein; that it has obtained control of sugar in the New Orleans market, and in an illegal and surreptitious way has shut off the sale of yellow clarified sugar in the markets of the United States, which sugar was manufactured in the state of Louisiana; that it has driven the planters of Louisiana out of competition with it in the market of this state and of other states; that it has compelled the planters of this state to make only raw sugars, of which the defendant company was virtually the only buyer, at prices fixed by it (the defendant); that it forced brokers and wholesale dealers to buy only the sugar refined by it.

The petition further states that many unlawful acts were committed by the defendant, some of which are set forth in the petitions, and among them, in order to keep up an appearance of competition, it had permitted the operation of the Henderson Sugar Refinery in New Orleans, which the state avers has been kept from and not permitted to develop into a large unit for operating, or of giving genuine competition to the American Sugar Refining Company, and that through its monopoly of the sugar trade it has refused to sell to Wogan Bros., Incorporated, an independent corporation, which was buying sugar from the year 1905 to 1908, and which sought to make arrangements with the planters in a small way to refine sugar, and it has thus forced said corporation out of business. It is further alleged that, while the defendant company was depressing the price of sugar in Louisiana through its monopoly and restraint of trade, it was buying sugar in New York and elsewhere at a greater price than it paid in Louisiana, because of its complete monopoly of the market in the state, and that defendant is depressing prices and monopolizing its control down to the date of the filing of this suit. It is alleged that the state of Louisiana produces 600,000,000 pounds of sugar per annum; that it is the chief industry of the state; and that it is being destroyed by the unlawful acts of the defendant. It is alleged that refined sugar is a necessary foodstuff; that the production of raw sugars furnishes a livelihood to many thousand persons in the state, and that the livelihood of such persons and the right of the public to have refined sugar at a reasonable price are imperiled by the continuous exercise of the monopoly of the defendant; that because of these illegal acts of the defendant, and the monopolizing of the industry of refining sugars in the state, and the arbitrary closing down by it of its refinery, the sugar industry has come to a complete standstill, and that the same results follow when the defendant withdraws from the market as a buyer of raw sugar, which it frequently does without legitimate reason; that the refining of sugar has become, because of the monopoly thereof by defendant, a business to which a public interest has attached; and that it should be taken out of the hands of the defendant, and be operated by the court, through a receiver, or otherwise, so as not to oppress the citizens of the state. The petition declares defendant is a grave public menace, and that its methods of business are against the public policy of the state; that.

the refinery of the defendant company in the parish of St. Bernard is the only refinery that can refine the Louisiana crop of sugar and which is in condition to be operated at the present time; and that defendant has arbitrarily closed said refinery.

A supplemental petition was filed by the state October 16, 1915, in which the allegations of the original petition are referred to, and some of them reiterated. It is further charged that there is a suit pending in the Southern District of New York wherein the United States government is seeking to enforce the Sherman Anti-Trust Law against the American Sugar Refining Company, which suit, together with the testimony taken therein, is contained in some 22 printed volumes, and which it (the state) asks the court to consider in connection with a rule nisi which has been issued in the case, and which will be mentioned hereafter. There are copied in said supplemental and amended petitions numerous letters which were taken and copied from the above-named record, many of which appear to have passed between the officers and employés of the defendant company, and that said letters constituted, in so far as petitioner was concerned, the first tangible proof of the existence of the felonious operations of the monopoly and conspiracy of the defendant.

The state asks that there be judgment against the defendant finding it guilty of offending against the anti-trust and anti-monopoly laws of the state of Louisiana, and particularly of having engaged in a conspiracy to force down the price of raw sugar, an agricultural product of this state, and to enhance the price of refined sugar in the state for speculative purposes, and of having conspired to restrain trade and commerce in sugar within the state of Louisiana, and of having monopolized and combined and conspired to monopolize the trade and commerce of sugar within the state, and to have there-

by forfeited the right to engage in the sugar refining business in the state, that the license of the defendant to do business in the state be revoked, canceled, and annulled, and that it be ousted from the state and perpetually enjoined from doing any business therein. It asks that a rule issue commanding the defendant to show cause why an injunction should not forthwith issue, prohibiting the misuse and abuse, by the defendant of the corporate franchises heretofore enjoyed by it under the Constitution and laws of this state and the carrying on of any business by it within the state, to show cause why, in order to render an injunction fully effective, there should not be a receiver appointed to all the property, rights, and credits of the defendant within the state, and why, in the interest of the public, the business of said defendant pendente lite should not be carried on by a receiver, and especially why the Chalmette Refinery should not be operated by him, and, in the alternative, if a receiver be not appointed with authority to operate it, why there should not be a judicial sequestration of all the property, rights, and credits of the defendant within the state of Louisiana, and why the preliminary injunction should not be perpetuated.

Defendant appeared and excepted to each and every one of the records and documents annexed to the petitions, and the copies of letters, telegrams, minutes of the defendant company, etc., which are incorporated in the petitions and purported to be made parts thereof, and objected to their being annexed to and made parts of the petition upon the ground that the same are scandalous and impertinent, are purely evidentiary in nature and character, and subject to such legal objections as defendant may make thereto when offered in evidence, if they are ever offered.

The motion to strike out was denied, but it was ordered and decreed that the docu-

ments and letters were not parts of the pleadings, and defendant was dispensed from answering to them, and the right was reserved to defendant to object to such letters and documents when offered in evidence, if ever offered. From this ruling, both parties have appealed.

Defendant further excepted on the ground that the petition of the state disclosed no cause of action.

The exceptions, in so far as they applied to the rule to show cause why a preliminary injunction should issue and a receiver be appointed, and a judicial sequestration be issued, were maintained, and the rule was dismissed, with the right reserved to plaintiff to renew said rule in the event that judgment of ouster be rendered in the case. The state has appealed from this judgment.

Act No. 11, p. 23, of the Extra Sessions of the State Legislature of 1915 is the last antitrust statute on the books of this state. The first three sections of the act provide for criminal prosecution against offenders in the district courts of the state and in the criminal district court for the parish of Orleans, which has exclusive criminal jurisdiction in that parish. Const. art. 139. The other sections of the act refer to civil proceedings in the district courts throughout the state and in the civil district court for the parish of Orleans, which has exclusive civil jurisdiction (Const. art. 133), for the purpose of forfeiting charters of domestic corporations and the ouster from the state of foreign corporations which offend against the provisions of the act.

In this case the state is proceeding against the defendant corporation civilly in the civil district court for the parish of Orleans. In section 13 of the act it is provided that the defendant in such case shall file all exceptions in limine litis, and that such exceptions shall be tried by preference, and that the appeal taken from the judgment rendered shall be taken within 5 days. This appeal is made returnable within 10 days, and the act further provides that the case shall be heard and determined within 40 days.

In the first section of the supplemental and amended petition filed by plaintiff it is alleged:

"That in the suit now pending in the Southern District of New York where the United States government seeks the enforcement of the Sherman Anti-Trust Law against the American Sugar Refining Company, the taking of testimony has been finished, and the case is being prepared for submission; that, inasmuch as the record in such proceeding is, under the law, cognizable in this court, petitioner will present herewith a true and correct copy of the case, and will ask that the court consider the same, particularly on the pending rule nisi."

Under the above allegation plaintiff has placed in the record and filed with the clerk of the civil district court for the parish of Orleans printed volumes containing some 9,-500 pages, being the record and evidence above referred to; and defendant has excepted to such proceeding on the ground that the record and evidence contained therein are purely evidentiary in nature and character, and subject to certain legal objections as it may make when offered in evidence, if ever so offered.

[1] A "petition" is defined to be a written document which the plaintiff addresses to a competent judge, setting forth the cause of the action which he intends to bring against the defendant, and praying to be permitted to cite that defendant before him in order that he may be ordered to do or to give a certain thing. It must contain a clear and concise statement of the object of the demand, as well as of the nature of the title, or the cause of action on which it is founded. Code of Practice, arts. 171 and 172. The petition must not contain some other cause of action which another party has brought against the defendant in another jurisdiction.

The plaintiff in its petition must state his cause of action articulately, that is to say,

he shall, so far as practicable, state each of the material facts upon which he bases his claim for relief in a separate paragraph, separately numbered, and the defendant in his answer must either admit or deny specifically each material allegation of fact contained in plaintiff's petition, and all material facts contained in the petition which are not denied in the answer are deemed to be admitted, and the plaintiff may, by rule, submit to the court the question of his right to a judgment upon the petition and answer. Act No. 157 of 1912, p. 225. Defendant cannot be called upon to admit or deny any material allegation of fact contained in the petition of another than plaintiff itself, and it cannot be called upon to deny allegations of the government of the United States made in a suit against the defendant in a federal court of New York. The record in such suit may, under the act, be offered in evidence; and the court will determine whether it shall be admitted or not, after considering objections which may be made to the offer. But the defendant in this cause cannot be called upon to answer the allegations made in the petition in the suit referred to; and, as the documents can form no part of the petition in this case, they should have been stricken from the record.

In its original and supplemental petitions the state has referred to certain letters said to have been issued and received by the defendant, and has copied some 80 to 100 letters, telegrams, documents, etc., in its supplemental petition which it declares—

"were discovered in the possession of the American Sugar Refining Company by the federal government during the trial of the suit mentioned in paragraph 1, above, and in paragraph 48 of the original petition herein."

It was further alleged:

"That said letters constituted, in so far as the petitioner was concerned, the first tangible proof of the existence of the felonious operation of the monopoly and trade conspiracy of the American Sugar Refining Company. Said letters were introduced by the United States government in said suit in the year 1912."

These letters should not have been copied into and made parts of the supplemental petition filed by plaintiff. Some of them are simply evidence of some material facts alleged in plaintiff's petition, and they really form no part thereof. For the same reason stated in connection with the record in the federal court, these letters, telegrams, etc., might be stricken from the petition; but, as they are copied therein and form physical parts thereof, they will not be ordered stricken, but the judgment appealed from will be affirmed in so far as it holds:

That "said documents are not parts of the pleadings, and defendant is dispensed from answering thereto; that said documents are merely exhibits to be offered in evidence on the trial of the cause, subject to defendant's right to interpose such objections to the admissibility in evidence thereof, or of any part thereof, as may be lawful and as it may be advised, the right thereto being hereby specially reserved to defendant."

The second exception filed by the defendant is to that portion of the original petition and the rule of plaintiff calling on it to show cause why a preliminary injunction and sequestration should not issue and for the appointment of a receiver.

The exceptions of the defendant to the rule were maintained, and the rule was dismissed, with the right reserved to plaintiff to renew said rule in the event that judgment for ouster was rendered. This exception will be considered later.

Defendant excepted further on the ground of prematurity, as Act No. 267 of 1914, § 29, p. 535, provides:

"That no action for the causes set out in paragraphs (b), (c), (e), (f) and (g) shall be instituted until thirty days notice shall have been given the corporation to correct the specific acts of which complaint is made," and that no such notice was given or is alleged to have been given.

Plaintiff on its brief, at page 12 says:

"This suit was not brought under Act No. 267 of 1914."

The exception was properly overruled, and will not therefore be further considered.

On the ground of vagueness and indefiniteness, the exceptions were properly overruled.

Next defendant excepts on the ground that the petition and amended petition do not disclose a cause of action on several grounds, which will be considered in their order.

[2] Const. 1879, arts. 235 and 237, require corporations to conduct their business in such manner as not to infringe the equal rights of individuals or the general well-being of the state, and that no corporation shall engage in any business other than that expressly authorized in its charter or incidental thereto. The same provisions of law are contained in articles 263 and 265 of the Constitutions of 1898 and 1913. In Const. 1898, art. 190, it is provided that:

"It shall be unlawful for persons or corporations, or their legal representatives, to combine or conspire together, or to unite or pool their interests for the purpose of forcing up or down the price of any agricultural product or article of necessity, for speculative purposes," etc.

So that the acts of the defendant set forth in plaintiff's petition charging conspiracy by defendant with others in uniting or pooling their interests for the purpose of forcing up or down the price of sugar for speculative purposes are in violation of the law as contained in the articles of the Constitution; and, where it is alleged that they were entered into subsequent to the adoption of the Constitution of 1898, they are properly charged as being unlawful.

[3] Morawetz (paragraph 645) lays down the rule:

"Any act of a corporation which is forbidden by its charter, or by a general rule of law, and, strictly, every act which the charter does not expressly or impliedly authorize the corporation to perform, is unlawful; and, if the doing of such act is an injury to the public, it may be sufficient ground for declaring a forfeiture of the corporate franchises."

And, where a foreign corporation commits acts which are forbidden by its charter or by a general rule of law, and that act is dangerous to the public, it may be sufficient ground for the state to ask for a revocation of license to do business within the state. A foreign corporation, under the comity existing between states, is authorized or licensed to do business within this state; but the business must be conducted in a lawful manner, and not in an unlawful manner and in a way injurious to the public.

The allegations of the petition show that the defendant, from almost the time it entered the state up to the present time, has grossly, deliberately, and persistently violated the public policy of the state by a monopoly of the sugar industry and trade, and that in its unlawful operation it has oppressed, and is oppressing, and will continue, if allowed to continue at all, to oppress, an absolutely dependent public in its use of one of the necessary foodstuffs produced and for sale in the state. And, as was said in the case of State v. Waterworks Co., 107 La. 1, 27, 31 South. 395, it requires no other law, and no other construction of law, than such as is found in, and authorized by, the Civil Code of this state, to reach such a conclusion in this case, if the state sustains its allegations with proper proof.

[4] The Civil Code declares in article 1895:

"The cause [of contract] is unlawful, when it is forbidden by law, when it is contra bonos mores or to public order."

And from the earliest times the courts of the state have declared contracts against the public policy of the state to be illegal and not enforceable. 2 Hennen's Digest, p. 1007, No. 1; India Bagging Association v. Kock, 14 La. Ann. 168; T. & P. Ry. Co. v. S. P. Ry. Co., 41 La. Ann. 970, 6 South. 888, 17 Am. St. Rep. 445; Fabacher v. Bryant & Mather, 46 La. Ann. 826, 15 South. 181.

"It has been said that there is perhaps no crime an exact definition of which is more difficult to give than the offense of conspiracy. The essentials of a conspiracy, whether viewed with regard to its importance in a criminal prosecution or its significance in a civil action for damages, are commonly described in this general

language: 'It is a combination between two or more persons to do a criminal or an unlawful act or a lawful act by criminal or unlawful means.'" 8 Cyc. 620.

It has been held that the term "conspiracy" is divisible into three heads: (1) Where the end to be attained is in itself a crime; (2) where the object is lawful, but the means to be resorted to are unlawful; (3) where the object is to do any injury to a third person or a class, although, if the wrong were inflicted by a single individual, it would be a wrong, and not a crime. Reg. v. Cornell, 14 C. C. 508.

Defendant is not only charged with having conspired to gain a monopoly of the sugar trade of this state, but that it has actually accomplished the monopoly of that trade, thereby unlawfully restraining the sugar trade of this state.

[5] "Monopoly" is defined in the English law to be:

"A license or privilege allowed by the King for the sole buying and selling, making, working, or using, of anything whatsoever, whereby the subject in general is restrained from that liberty of manufacturing or trading which he had before." 4 Blackstone, Com. 159; 4 Stevens, Com. 291; Black's Law Dict.
"It is said to be a monopoly when one person alone buys up the whole of one kind of commodity, fixing a price at his own pleasure." 27 Cyc. 889.

Any scheme to corner the market by getting control of the available supply of an article of commerce is illegal; and so all contracts made in promotion of such a scheme are unenforceable.

Whatever device may be used to get control of supplies, whether by option or by lease, may be held to have the taint of monopolization, if the intent is to regain control of the market thereby. 27 Cyc. 898.

Whether a monopoly has been created by the state or by private parties, it has been considered in modern times as opposed to the interests of the people; as it deprives them, or it may deprive them, of their livelihood, and it has a tendency to enhance the price which people must pay for the article monopolized. There was much legislation under the early law to bring about the punishment of those persons who gained a monopoly of the market of any article by any means. Such action was said to be opposed to the common law. And the persons engaging in monopolies were declared to be guilty of criminal acts. From the earlier times it was considered a serious matter if several combined and controlled trade at enhanced prices, whether or not the conspiracy was carried out or individuals were harmed. In consequence of all this, contracts and understandings in restraint of trade or labor were held unenforceable as against public policy. It may be said in general monopolization of any thing which the public needs is against public policy.

The commonest type of combination has been that of pool of some sort, in which the participants agreed to suppress the competition between themselves to some extent without surrendering altogether all their rights and conduct of their own business. Under similar principles any device or arrangement by way of license or lease whereby competition is suppressed is illegal both by common law and statutes. Agreements by way of trusts or otherwise whereby competition between concerns is suppressed are held illegal both under the common law and statutes. By weight of authority it seems to be illegal to bring about a monopoly for the formation of a consolidated corporation to acquire existing competing concerns by outright purchase of their property; and sugar refiners are mentioned in 27 Cyc. 902, as having been engaged in carrying on a monopoly in the sugar trade in restraint of trade.

All of these offenses are charged in the petition of the state against this defendant; and, as this is a civil proceeding, the declarations in the petition sufficiently set forth a

conspiracy and unlawful monopoly in restraint of trade, which are the gist of the action.

It is generally agreed that statutes directly against competition in restraint of trade are not in violation of the constitutional provision guaranteeing liberty and property, since the regulation of monopolies, as dangerous to society, have always been a recognized part of the police power of the state; but it is not clear that such statutes will be supported if they are retrospective in their operation or discriminating in their application.

The ground upon which agreements and combinations in restraint of trade are held illegal at common law is that they are contrary to public policy; and the public policy of a state is to be found in its statutes, and, when they have not directly spoken, then in the decisions of the courts. But, when the Legislature speaks upon a subject upon which it has the constitutional power to legislate, public policy is what the statutes passed by it enacts public policy to be. The only authentic and admissible evidence of public policy of a state on any given subject are its Constitutions, laws, and judicial decisions. The public policy of a state, of which courts take notice and which they give effect, must be decided from those sources. Where the state has spoken through its legislators, there is no room for speculation as to what the policy of the state is. 9 Cyc. 482. And the state of Louisiana has announced its public policy with respect to combinations and monopolies in restraint of trade for the first time, in so far as the court is informed, in Act No. 86 of 1890, p. 90. That is a criminal statute entitled:

"An act to protect trade and commerce against unlawful restraints * * * and to provide penalties for the violation of this act."

[6] The state is a necessary party to a proceeding against a corporation either for its dissolution or for the revocation of its license

to do business in the state, if it is a foreign corporation. In the latter case the judgment would be that the party be ousted. Chancellor Kent, in his Commentaries (volume 2, p. 378, Comstock's Edition), says that there were two modes of proceeding judicially to ascertain and enforce the forfeiture of a charter for default or abuse of power—the one by scire facias; the other an information in the nature of a quo warranto; both these modes of proceeding against corporations being at the instance and on behalf of the government.

The state did not, by granting permission to defendant to carry on the business of dealing in and refining sugar, preclude itself from seeking, by proper judicial proceedings, to reclaim the franchises and privileges she had given, when they should be so misused as to defeat the object of the grant, or when the company had become insolvent and not able to meet the obligations which it may have assumed. The claim therefore cannot obtain that the ouster of defendant from doing business in the state of Louisiana for the violation of the charter of defendant and the revocation of the license granted it by the state, as authorized by the anti-trust statutes, would be the taking of defendant's property without due process of law, or that a judgment to. that effect would deny to defendant the equal protection of the law.

Revised Statutes, § 131, makes it the duty of the Attorney General, in cases where the state is plaintiff for the dissolution of a corporation and the forfeiture of its charter, to appear for the state and prosecute and conduct in the district courts of the city of New Orleans all such suits. As a suit for the revocation of a license to do business in the state by a corporation of another state is similar to the proceedings for the dissolution of a home corporation which has violated the laws of the state, the Attorney General had the right to institute and prosecute this suit.

[7] And article 190 of the Constitution, as

it is enlarged in the Constitution of 1913, specially provides that:

"All combinations, trusts, or conspiracies in restraint of trade or commerce, and all monopolies or combinations to monopolize trade or commerce, are hereby prohibited in the state of Louisiana, and it shall be the duty of the Attorney General, of his own motion, or any district attorney of the state, when so directed by the Governor or the Attorney General, to enforce this provision, by injunction or other legal proceedings, in the name of the state of Louisiana, and particularly by suits for the forfeiture of the charters of offending corporations, incorporated under the laws of the state of Louisiana, and for the ouster from the state of foreign corporations. Provided, however, that nothing herein contained shall prevent the Legislature from providing additional remedies for the enforcement of this article. The provisions of this article are self-operative."

There is therefore special authority given to the Attorney General to appear for the state in this suit, and to ask for the ouster of the defendant corporation in the ordinary form of procedure without resorting to the writ of quo warranto.

In the case of Chicago Life Insurance Co. v. Needles, 113 U. S. 574, 5 Sup. Ct. 681, 28 L. Ed. 1084, it is held that:

"The right of the plaintiff in error to exist as a corporation, and its authority in that capacity to conduct the particular business for which it was created, were granted subject to the condition that the privileges and franchises conferred upon it should not be abused or so employed as to defeat the ends for which it was established, and that, when so abused or misemployed, they might be withdrawn or reclaimed by the state, in such way and by such modes of procedure as were consistent with law. Although no such condition is expressed in the company's charter it is necessarily implied in every grant of corporate existence. Terrett v. Taylor, 9 Cranch, 43, 51 [3 L. Ed. 650]; Angell & Ames on Corporations (9th Ed.) § 1024, notes.

"Equally implied, in our judgment, is the condition that the corporation shall be subject to such reasonable regulations, in respect to the general conduct of its affairs, as the Legislature may from time to time prescribe which do not materially interfere with or obstruct the substantial enjoyment of the privileges the state has granted, and serve only to secure the ends for which the corporation was created. * * * It would be extraordinary if the legislative department of a government, charged with the duty of enacting such laws as may promote the health, the morals, and the prosperity of the people, might not, when unrestrained by constitutional limitations upon its authority, provide by reasonable regulations against the misuse of special corporate privileges which it has granted, and which could not, except by sanction, express or implied, have been exercised at all. * * *

"It is only as bearing upon the question of the power of the state without any express reservation to that end having been made in the charter of the company, to subject it to such regulations as those established by the act of 1869, or to compel it to cease doing business when the circumstances exist which are set out in the act of 1874, that we have referred to, the facts which counsel for the state contend are fully established by the evidence. If the state had no such power, then the statute under which she proceeds would impair the contract which the company had with her by its charter. But can it be possible that the state, which brought this corporation into existence for the purpose of conducting the business of life insurance, is powerless to protect the people against it, when, assuming, as we must, the facts to be such as the judgment below implies, its further continuance in business would defeat the object of its creation and be a fraud upon the public and on its creditors and policy holders? * * * The act of 1869 does not contain any regulation respecting the affairs of any corporation of Illinois which is not reasonable in its character, or which is not promotive of the interests of all concerned in its management. It only guards against mismanagement and misconduct; its requirements constituted reasonable regulations of the business of such local corporation; it does not impair the obligation of any contract which this company had with the state; the conditions imposed upon the rights of the company to continue the issuing of policies are neither arbitrary nor oppressive. * * *

"There is no denial, as counsel supposes, of the equal protection of the laws, nor any deprivation of property without due process of law; for that statute authorizes a public officer to bring the company before a judicial tribunal, which, after full opportunity for defense, may determine whether it is insolvent, or its condition such as to render its continuance in business hazardous to the insured or to the public, or whether it has exceeded its corporate powers, or violated the rules, restrictions, or conditions prescribed by law, grounds which, if established, constitute sufficient reason why the corporate franchises and privileges granted by the state should be no longer enjoyed. * * * That a suit, for such purposes, might be instituted if, in the opinion of the auditor of state, any of those grounds existed, affords no justification to characterize this proceeding as harsh or arbitrary; for at last the final judgment of the court must depend upon the facts as established by competent evidence, and not upon the mere opinion of that officer. * * *

"'A corporation, by the very terms and nature of its political existence, is subject to a dis-

solution, by a surrender of its corporate franchises, and by a forfeiture of them for willful misuse and nonuse. * * * And it would be a doctrine new in the law that the existence of a private contract of the corporation should force upon it a perpetuity of existence, contrary to public policy, and the nature and objects of its charter.' * * * The state did not, by granting the original and amended charter, preclude herself from seeking, by proper judicial proceedings, to reclaim the franchises and privileges she had given, when they should be so misused as to defeat the objects of her grant, or when the company had become insolvent so as not to be able to meet the obligations which, under the authority of the state, it had assumed to policy holders and creditors."

Article 190 of the Constitution and Act No. 11 of the Extra Session of 1915 do not contain any regulation with reference to proceedings against persons and corporations for the commission of unlawful acts there set out which are not reasonable in their character, or which are not promotive of all concerned. The state permitted or licensed this defendant to do business in this state, and the state alone has the power to protect the people against it, assuming, as we must on the trial of this exception, that the allegations contained in plaintiff's petition are true. The further continuance in business by defendant would defeat the very object of admitting it into the state to transact business, and it would be a fraud upon the public, and upon those who are forced to transact business with it.

[8] The Civil Code provides in article 447 that corporations legally established may be dissolved—

"by the forfeiture of their charter, when the corporation abuses its privileges, or refuses to accomplish the conditions on which such privileges were granted, in which case the corporation becomes extinct by the effect of the violation of the conditions of the act of incorporation."

The Legislature passed anti-trust statutes in 1890, 1914, and 1915. These statutes refer to persons and to home and foreign corporations. The first is a criminal statute, Act No. 86 of 1890, p. 90, and makes it a misdemean-

138 LA.—33

or to enter into a contract, combination in the form of trust, or conspiracy in restraint of trade or commerce, or to fix or limit the amount or quantity of any article, commodity, or merchandise to be manufactured, mined, produced, or sold in this state; and section 3 of the act declares it to be a misdemeanor to monopolize, or attempt to monopolize, any part of the trade or commerce within the limits of this state. This act is embraced in the last act on the subject-matter, Act No. 11 of 1915, p. 23. So that every alleged illegal act of the defendant since the year 1890 has been done, if done, in contravention of the statute of that year; and competent evidence of such acts would be admissible on the trial of the cause.

Defendant attacks the constitutionality of the several anti-trust acts of the Legislature and the validity of article 190 of the Constitution of 1913. If they are invalid, or if they are prospective only in their terms, the cause of action set up in the petition of the state is sufficient under the general laws of the state, and all of the acts of the defendant which are alleged and complained of in that petition are and were in violation of those laws, and the petition therefore contains a cause of action, and the allegations, if proved, would sustain a judgment of ouster.

But article 190 of the Constitution of 1913 and the anti-trust acts of 1890 and 1915 are not inoperative or invalid.

[9, 10] The first objection leveled at the acts of 1890 and 1915 is that the titles thereto do not express the objects thereof, in that the titles purport to legislate with regard only to unlawful restraints of trade, whereas the acts themselves embrace "all" restraints of trade, whether lawful or unlawful; and therein the said titles of the acts violate article 31 of the Constitution of Louisiana, which provides that:

"Every law enacted by the General Assembly shall embrace but one object, and that shall be expressed in its title."

The article of the Constitution just quoted makes the title of the act a very important part of that instrument; and, when the title provides against unlawful restraints and monopolies, and the body refers to "every contract, combination in the form of trusts, or conspiracy, in restraint of trade or commerce, or to fix or limit the amount or quantity of any article, commodity or merchandise to be manufactured, mined, produced or sold in this state," as being illegal, it is clear that only unlawful acts in restraint of trade are declared to be illegal, and punished in the manner indicated in the act.

Judge Cooley, in the seventh edition of his work on Constitutional Limitations (page 89 et seq.), lays down the rule of construction of statutes and Constitutions in the following language:

"The object of construction, as applied to a written Constitution, is to give effect to the intent of the people in adopting it. In the case of all written laws it is the intent of the lawgiver that is to be enforced. But this intent is to be found in the instrument itself. It is to be presumed that language has been employed with sufficient precision to convey it, and, unless examination demonstrates that the presumption does not hold good in the particular case, nothing will remain except to enforce it. 'Where a law is plain and unambiguous, whether it be expressed in general or limited terms, the Legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction.' Possible or even probable meanings, when one is plainly declared in the instrument itself, the courts are not at liberty to search for elsewhere.

"Whether we are considering an agreement between parties, a statute, or a Constitution, with a view to its interpretation, the thing which we are to seek is the thought which it expresses. To ascertain this, the first resort in all cases is to the natural signification of the words employed, in the order of grammatical arrangement in which the framers of the instrument have placed them. If, thus regarded, the words embody a definite meaning, which involves no absurdity and no contradiction between differents parts of the same writing, then that meaning, apparent on the face of the instrument, is the one which alone we are at liberty to say was intended to be conveyed. In such a case there is no room for construction. That which the words declare is the meaning of the instrument, and neither courts nor Legislatures have a right to add to or take away from that meaning."

The title to Act No. 86 was adopted at the same time that sections 1, 2, and 3 were adopted, and they were adopted as a whole. The sections are construed with the title to get at the intention and action of the Legislature.

"It is therefore a very proper rule of construction that the whole is to be examined with a view to arriving at the true intention of each part; and this Sir Edward Coke regards as the most natural and genuine method of expounding a statute. If any section of a law be intricate, obscure, or doubtful, the proper mode of discovering its true meaning is by comparing it with the other sections, and finding out the sense of one clause by the words or obvious intent of another. And in making this comparison it is not to be supposed that any words have been employed without occasion, or without intent that they should have effect as part of the law. The rule applicable here is that effect is to be given, if possible, to the whole instrument, and to every section and clause. If different portions seem to conflict, the courts must harmonize them, if practicable, and must lean in favor of a construction which will render every word operative, rather than one which will make some words idle and nugatory. * * *

"In interpreting clauses we must presume the words have been employed in their natural and ordinary meaning. As Marshall, C. J., says: 'The framers of the Constitution and the people who adopted it "must be understood to have employed words in their natural sense, and to have intended what they have said." This is but saying that no forced or unnatural construction is to be put upon their language.'" Cooley, p. 91.

"We are not to import difficulties into a Constitution by a consideration of extrinsic facts when none appear upon its face. If, however, a difficulty really exists, which an examination of every part of the instrument does not enable us to remove, there are certain extrinsic ways which may be resorted to, and which are more or less satisfactory in the light they afford. Among these aides is a contemplation of the object to be accomplished or the mischief designed to be remedied or guarded against by the clause by which the ambiguity is met with. 'When we once know the reason which alone determined the will of the lawmakers, we ought to interpret and apply the words used in a manner suitable and consonant to that reason, and as will be best calculated to effectuate the intent. Great caution should always be observed in the application of this rule to particular given cases; that is, we ought always to be certain that we do know, and have actually ascertained, the true and only reason which induced the act. It is never allowable to indulge in vague and uncertain conjecture, or in supposed reasons and views of the framers of an act, where there are none known with any degree of certainty.' The

prior state of the law will sometimes furnish the clew to the real meaning of the ambiguous provision, and it is especially important to look into it if the Constitution is the successor to another, and in the particular in question essential changes have apparently been made." Cooley, p. 100.

The intent of the Legislature, as expressed in the title to the act under consideration, is to protect trade against unlawful restraint and monopoly; and, as these unlawful restraints and monopolies have been known to exist from time immemorial, and as this reason is that which existed for the passage of the act, the construction that only unlawful acts are referred to in the body of the act is certain.

[11] The next objection to the act is that, if the language thereof be construed to embrace only unlawful restraints of trade, then that it violates article 8 of the Constitution, in that it does not define what constitutes an unlawful restraint of trade, and the courts are without power to supply such definition without violating articles 10, 16, 17 and 21 of the Constitution.

Article 10 of the Constitution provides that the accused in all criminal prosecutions shall be informed of the nature of the accusation against him; and it is argued that Act No. 86, at present under consideration, does not define the crime or offense charged against this defendant. It provides:

"That every contract, combination in the form of trust, or conspiracy, in restraint of trade or commerce or to fix or limit the amount of quantity of any article, commodity or merchandise to be manufactured, mined, produced or sold in this state is hereby declared illegal.

"Sec. 2. That every person who shall make any such contract, or engage in any such combination, or conspiracy, shall be deemed guilty of a misdemeanor, and on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both of said punishments, in the discretion of the court.

"Sec. 3. That every person who shall monopolize, or attempt to monopolize, or combine, or conspire with any other person or persons, to monopolize any part of the trade or commerce within the limits of this state, shall be deemed guilty of a misdemeanor," and on conviction

shall be punished in the manner indicated in section 2.

The offense is clearly defined in the sections of the act. The words used therein are simple and definite in their meaning. In construing Constitutions and statutes the courts cannot forget the well-understood meaning of words and phrases which have long been in use; and these meanings will be attributed to the words used in the statute. Every contract between individuals and corporations which is made in restraint of trade or commerce, every combination in the form of trust or conspiracy in restraint of trade or commerce, or any other form of trust or conspiracy to limit the amount or quantity of any article, commodity, or merchandise to be manufactured, mined, produced, or sold in this state, is declared to be illegal. Every person or corporation charged with doing any one or all of these acts in restraint of trade, after hearing and trial, may be convicted under the act as having been guilty of a misdemeanor; and may be punished. The statute is clear in its intent and meaning; and one charged under the terms thereof is fully informed as to the nature and cause of the accusation against him.

The other articles of the Constitution, Nos. 16, 17, and 21, refer to the three departments of the government and the respective duties and functions attaching to each. As we have seen that the Legislature has clearly defined the misdemeanor which might be charged under Act No. 86 of 1890, it is unnecessary to discuss these articles.

The last objection to the act is that it does not apply to corporations. This may be true, but the act nevertheless provides against every unlawful contract, combination, etc., in restraint of trade or commerce; and it has therefore been unlawful for any person, natural or artificial, to do any of the acts therein enumerated in restraint of trade or commerce.

Defendant next urges that no cause of ac-

tion is shown in the petition under article 190 of the Constitution of 1913. Objection is here made to the general language used in the article, which defendant contends makes it unlawful for corporations to combine and to effect monopolies, etc. It is quite clear, as has been seen in considering the act of 1890, that the intention was to punish unlawful acts in restraint of trade, and not lawful acts which operated as monopolies, etc.

. [12, 13] It is next urged that the terms of said article of the Constitution are prospective, and have, and can be held to have, no retrospective effect or ex post facto application, and, as the petition alleges that the acts said to have been committed were committed prior to the adoption of article 190 in 1913, that the remedy prescribed in said article cannot be enforced against it. It has just been held that the acts complained of in the petition of the state—that is, those acts subsequent in date to the passage of Act No. 86 of 1890—are violative of the terms of that act; that they are illegal, and were illegal at the time of their commission. The remedies provided for in the article of the Constitution may clearly be applied by the state in the prosecution of this defendant, or for the forfeiture of charters of offending corporations incorporated under the laws of the state, and for the ouster from the state of a foreign corporation.

Article 190 of the Constitution and the anti-trust act of 1915 give relief by injunction or other legal proceeding, and defendant pleads that such relief is in violation of its property rights. The Constitution and the acts of the Legislature provide for the issuance of the writ of injunction, in the discretion of the court, "because of irreparable injury to the public interests," and the issuance of an injunction has always been a form of procedure in the courts of the state upon proper showing being made. The writ of injunction is, like those for attachment, seques-

tration, etc., a conservative writ; and any one of these writs may be issued by the court, in the exercise of a sound discretion. If a preliminary injunction were to issue on the allegation of the state that the defendant corporation was bankrupt, or had abandoned its property, or had been convicted in the criminal court of violating the anti-trust laws of this state, a preliminary injunction might probably issue. And defendant in its brief says:

"It is freely conceded that a law may validly provide for the issuance, at any stage of the proceedings, of an injunction to restrain or prevent the continuance of unlawful acts; in which case the particular unlawful acts being done or threatened to be done must be specified. The person so enjoined is in such case advised as to what he may not lawfully do under the court's order."

And again:

"It is plain that, if a violation or violations of the law be charged against a sugar refiner, the continuance of the illegal act or conduct may be fully and completely suspended pendente lite by an injunction against the doing of the specific illegal acts."

And that is all that the Constitution and the act of 1915 authorize to be done in the way of issuing a preliminary injunction.

The judgment of the district court overruling the exception of no cause of action to the petition of the state for ouster and a definitive injunction is sustained.

Turning now to a further consideration of that portion of the petition which involves the application for a preliminary injunction or writ of sequestration against defendant, and the appointment of a receiver in limine, in which plaintiff seeks to take possession of defendant's property and business before a judgment of ouster has been rendered, and which is covered by a separate exception by defendant and a separate judgment, from which the state appeals, we fail to find sufficient allegations in the petition for such relief.

The act, in section 8, provides a mode of relief for persons, firms, corporations, or as-

sociations which may have suffered loss or damage by violations of the act.

Under act 11 of 1915, p. 23, a preliminary injunction may issue, on petition of the state, in case of irreparable injury to the public interest; and the state has not shown irreparable injury to the public interests.

The petitions do not show a cause of action for the issuance of a preliminary injunction or for a writ of sequestration; and, as the appointment of a receiver depends upon the issuance of an injunction, no cause of action is shown for them.

It is therefore ordered, adjudged, and decreed that the two interlocutory judgments appealed from in this case be amended by striking from the record the printed volumes in the case of the United States of America v. The American Sugar Refining Company and Others, pending in the District Court of the United States for the Southern District of New York in the Second Circuit, and, as thus amended, the two judgments are affirmed; costs of appeal to be paid by the state.

See concurring opinion of O'NIELL, J., 71 South. 147.