518 So.2d 1050 (1987)
LOUISIANA POWER & LIGHT COMPANY
v.
UNITED GAS PIPE LINE COMPANY and Pennzoil Company.
No. CA-1111.
Court of Appeal of Louisiana, Fourth Circuit.
June 1, 1987.
Rehearing Denied February 11, 1988.
*1051 W.T. Tete of Mars, Medo & Tete, and Monroe & Lemann, Andrew P. Carter, Kenneth P. Carter and Terrence G. O'Brien, New Orleans, for plaintiff and appellant Louisiana Power & Light Co.
Stephen M. Hackerman, Baker & Botts, Houston, Tex., Gene W. Lafitte and Frederick W. Bradley, Liskow & Lewis, New Orleans, for defendant-appellee Pennzoil Co.
C. Murphy Moss, Jr. and James M. Petersen, Lemle, Kelleher, Kohlmeyer, Dennery, Hunley, Moss & Frilot, New Orleans, and David J. Hill, Pierson Semmes & Finley, Washington, D.C., for defendant-appellee United Gas Pipe Line Co.
Before GARRISON, BYRNES and ARMSTRONG, JJ.

ON REMAND FROM THE SUPREME COURT
BYRNES, Judge.
This is the second time we have reviewed this multi-million dollar anti-trust case.
In our original opinion, reported at 478 So.2d 1240, (La.App. 4th Cir.1985), we considered and rejected LP & L's claims that either United Gas Pipeline Company (United) or Pennzoil Company (Pennzoil) had violated R.S. 51:123 by monopolizing or attempting to monopolize the sale of natural gas in the area of LP & L's Ninemile Point electric generating station. This ruling was affirmed by the Supreme Court in Louisiana Power & Light Co. v. United Gas Pipeline Co., 493 So.2d 1149 (La.1986).
We also considered and rejected LP & L's claim that United and Pennzoil had violated La.R.S. 51:122 by conspiring to restrain trade in the geographic and product markets LP & L attempted to define. This ruling was based on our conclusion that Pennzoil's partial ownership of United gave it the power to control United's economic decisions, making a conspiracy between these corporations impossible.
The Supreme Court disagreed with our legal conclusion regarding conspiratorial capacity, and held that the mere formality of separate incorporation was sufficient to establish that capacity, even in the face of proof that one of the alleged conspirators was not free to accept or reject the plan of action proposed by the other. For this reason, the case was remanded to us to reconsider the trial court's dismissal of LP & L's restraint of trade claim.
In our original opinion we analyzed the record and reached the factual conclusion that United was not an independent economic decisionmaker because Pennzoil controlled United's board of directors and had the power to veto any decision which conflicted with Pennzoil's plans. This factual conclusion led us to find that United lacked the capacity to conspire with Pennzoil. *1052 Upon further reflection, we feel it would have been more accurate to say that United did not, in fact, conspire with Pennzoil even though it was theoretically possible for it to do so.
A conspiracy implies an agreement. An agreement implies an element of choice, which is absent when a subsidiary can be ordered to obey its parent's directives. Because United had no freedom of choice regarding participation in Pennzoil's plans, we concluded in our original opinion that United had not agreed with Pennzoil (in the sense of a voluntary meeting of the minds) and therefore had not entered into a conspiracy. We are still of this opinion. However, in light of the Supreme Courts rejection of this portion of our earlier decision (albeit on the basis its disagreement with our legal conclusion that United lacked the capacity to conspire with Pennzoil) we choose to ground the present opinion on an evaluation of whether the evidence LP & L presented at trial was sufficient to prove that trade was restrained.
The Supreme Court's remand included instructions that:
[R]enewed consideration [of LP & L's restraint of trade claim] is to be based upon an examination of the record concerning whether LP & L proved by a preponderance of the evidence a conspiracy in restraint of trade by defendants Pennzoil and UGPL; and whether, according the trial court judgment its appropriate deference, that judgment should be affirmed or reversed on appeal.
Thus, our review of the record will be directed at determining whether the trial court's conclusion that LP & L failed to prove a conspiracy to restrain trade by a preponderance of the evidence was manifestly erroneous, and whether dismissal of that claim pursuant to C.C.P. Art. 1672(B) (formerly Art. 1810(B)) was clearly wrong. Cosse v. Bruley, 445 So.2d 41 (La.App. 4th Cir.1984).
If the evidence before the trial court provided a reasonable basis for its factual conclusions and inferences, this court should not substitute its evaluation of the evidence for that of the trial court. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978), Carter v. Koehring Co., 283 So.2d 716 (La.1973). Moreover, as noted in our original opinion, the trial court did not assign reasons for judgment. Thus, in evaluating the significance and meaning of the sometimes conflicting evidence and testimony offered at trial, we must assume that the trial court accepted the version which comports with its judgment. Karisny v. Sunshine Biscuits Inc., 215 So.2d 201 (La. App. 3rd. Cir.1968), Ortego v. Brouillette, 347 So.2d 1209 (La.App.1st. Cir.1977).

ANALYSIS
R.S. 51:122 is virtually identical to Sec. 1 et seq. of the Sherman Act (15 U.S.C. § 1 et seq.) and provides in pertinent part that:
Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in this state is illegal.
Although this language (and the analogous language of Section 1 of the Sherman Act) is broad enough to encompass every conceivable form of contract or combination which might restrain trade, it has not been applied literally by the courts. As the U.S. Supreme Court observed in National Society of Engineers v. Unites States, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978).
One problem presented by the language of Section 1 of the Sherman Act is that it cannot mean what it says. The statute says that "every" contract that restrains trade is unlawful. But, as Mr. Justice Brandeis perceptively noted, restraint is the very essence of every contract; read literally, Section 1 would outlaw the entire body of private contract law. Yet it is that body of law that establishes the enforceability of commercial agreements and enables competitive markets-indeed, a competitive economy-to function effectively. (Footnotes ommitted)
For this reason, Federal Courts have been attempting since 1898 to formulate some standard by which to differentiate between those contracts and combinations which Congress intended to be forbidden *1053 by the Sherman Act and those which it did not. See United States v. Addyston Pipe and Steel Co., 85 F. 271 (6th Cir.1898). By 1911 these efforts led the U.S. Supreme Court to adopt the Rule of Reason as the standard for judging whether or not a particular agreement violated Section 1 of the Sherman Act. Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911).
Under the Rule of Reason the legality of an anti-trust defendant's conduct is examined in light of all the circumstances of the case to determine if it imposes an unreasonable restraint on competition. Continental T.V. Inc., v. GTE Sylvania Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), Chicago Board of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918). The ultimate goal of the Rule of Reason is to help courts form a judgment about the impact of a given restraint on competitive conditions.
Although Louisiana's anti-trust law is not nearly as well developed as the Federal Law, our courts have nonetheless recognized that the broad language of Louisiana's prohibition against every contract, combination, or conspiracy in restraint of trade should not be taken literally, but must be interpreted to reach only those combinations which are "unlawful". See State v. American Sugar Refining Co., 138 La. 1005, 71 So. 137 (1916), Tooke & Reynolds v. Bastrop Ice & Storage Co., 172 La. 781, 135 So. 239 (1931). In Tooke & Reynolds, the Supreme Court considered the circumstances under which a particular combination or conspiracy could be found to have restrained trade and held that:
Trade may be restrained in more ways than one. Any and all devices and schemes which have for their purpose the suppression of competition and the control of the market necessarily tend to restrain trade in the article sought to be controlled. The basis of this law against restraints in trade is the theory that competition is the life of trade and advances public welfare. All combinations and arrangements which have for their purpose the unlawful stifling or restriction of competition, or which may probably have that effect, or necessarily have that tendency, are against public policy and unlawful. (Emphasis added)
In reviewing our earlier opinion in this case, the Louisiana Supreme Court, citing Tooke & Reynolds, recognized that R.S. 51:122 was only intended to prohibit unreasonable restraints of trade. Because Louisiana has adopted the Rule of Reason as the preferred method of analyzing restraint of trade claims, it seems safe to assume that Federal jurisprudence would be persuasive in cases involving an alleged violation of R.S. 51:122. This conclusion appears to comport with our Supreme Court's expressed preference for "a case by case analysis of ... whether a particular action affected an unreasonable restraint of trade", and its acknowledgement that "La. Rev.Stat.Ann. Sec. 51:122 is a counterpart to Sec. 1 of the Sherman Antitrust Act." 493 So.2d at 1156, 1158.
As discussed in our original opinion, and reiterated by LP & L in its brief on remand to this court, LP & L contends that United and Pennzoil conspired to restrain trade by misrepresenting facts regarding the size of their gas reserves and the jurisdictional status of their pipelines and by continuing to undertake new sales obligations in the absence of a reliable future supply of gas to meet those obligations. The effect of these activities, LP & L argues, was to foreclose competition by other suppliers of gas at its Ninemile Point power plant, enhance the price United/Pennzoil received for its gas, and restrict the supply of intrastate gas in the New Orleans area. LP & L had the burden of proving these claims by a preponderance of the evidence.
The trial court, after hearing the testimony of forty witnesses (which produced a transcript of more than 24,000 pages) and reviewing more than 1,000 exhibits, concluded that LP & L had failed to meet its burden of proof. After careful review of the record we cannot say that this conclusion was manifestly erroneous or that dismissal of LP & L's anti-trust claim under C.C.P. Art. 1810(B) was clearly wrong.
*1054 The most fundamental flaw which we perceive in LP & L's case is the almost total lack of evidence relating to the effect of the alleged conspiracy on competition as opposed to its effect on LP & L. Although LP & L's brief is replete with allegations that the conspiracy interfered with "price and market mechanisms", much of the testimony and evidence LP & L introduced seems directed at showing how United/Pennzoil's activities harmed LP & L. We are asked to assume that because LP & L was harmed, competition was harmed. This is simply not a reasonable assumption.
To begin with, LP & L did not even attempt to show that any gas supplier other than Texaco was willing or, more importantly, able to supply it with gas. As LP & L itself admits, the cost of constructing a pipeline presents a significant financial barrier to those wishing to enter the gas pipeline business. The fact that other pipelines and suppliers existed does not mean they had uncommitted reserves available to meet LP & L's needs or the working capital to build a pipeline to bring those reserves to LP & L at Ninemile Point. Since Texaco had already constructed a pipeline to Ninemile Point in order to obtain two thirds of the supply business at that location, it seems unlikely that another company would find it economically feasible to duplicate this effort. While we recognize that a company might have decided that the capital investment was worth the limited business, we are not willing to assume this in the absence of some proof. None was offered.
LP & L's market/supply data is simply not sufficient to show what, if any, effect the alleged conspiracy between United and Pennzoil had on competition in the geographic and product markets LP & L attempted to define. In fact, on its face LP & L's data shows United's share of the market decreasing. Other companies obviously picked up the business United lost and in this sense there was more rather than less competition in the market place during the period of the alleged conspiracy. LP & L asks us to assume that had United's supply problems been made public earlier, the gas industry would somehow have shifted into high gear, increased exploration efforts, and prevented or lessened the shortage of gas which the entire nation as well as United suffered in the 1970's. Once again, there is not sufficient proof in the record to make this a reasonable assumption.
LP & L presented no testimony or evidence from other gas pipelines or producers to show that their decisions regarding exploration, reserves, or pricing were influenced by United's supplies (or lack thereof). No evidence of the development and expansion plans or supply/demand conditions of those potential competitors was presented by LP & L. Apparently, LP & L's anti-trust expert did not even study or communicate with these companies. Without such information, it is difficult to know or predict how the "marketplace" would have reacted to an earlier disclosure of United's supply/reserve situation.
LP & L also claims that United foreclosed competition by misrepresenting to LP & L that the gas United contracted to supply to the Ninemile Point powerplant in the 1968 renegotiation of its 1952 supply contract with LP & L would come entirely from United's intrastate reserves. The record disproves this claim. An LP & L inter office memo regarding negotiations for gas supplies at Ninemile Point clearly show that at least some of the gas United was offering would come from offshore development. This is interstate gas. LP & L's contract with Texaco, executed at the same time as the United contract, specifically provided that the gas Texaco supplied would be intrastateits contract with United did not. Moreover, it appears that LP & L structured its gas receiving facilities at Ninemile Point so that Texaco's gas would not mix with United's. This would not have been necessary if LP & L had expected only intrastate gas from United. Finally, the cost-plus pricing formula in the 1968 United/LP & L contract takes the cost of offshore (interstate) into consideration; yet another indication that the use of interstate gas was contemplated, or at least discussed, by the parties.
*1055 This evidence convinces us, as it must have convinced the trial court, that United's 1968 contract did not require it to serve LP & L with only intrastate gas and that LP & L was aware that interstate gas might be used. Moreover, as we observed in our original opinion, the presence of Texaco as supplier of two thirds of Ninemile Point's gas requirements and the decrese in the price United charged LP & L for its gas as a result of Texaco's presence tends to show that competition in that market was vigorous. The record shows that LP & L wanted more than one supplier for Ninemile Point. Presumably, LP & L solicited bids from whomever was available to serve its needs in an effort to strike the best bargin; yet the record is devoid of evidence that anyone other than Texaco stepped forward. It seems unreasonable to conclude that United's conduct restrained competition in light of a record which does not show that any company other than Texaco had the financial resources and uncommitted production capability needed to compete for LP & L's business.
LP & L also contends that United/Pennzoil created an artificial shortage of gas on both its interstate and intrastate systems in order to trigger Federal Power Commission (FPC) curtailment and thus reduce delivery to power plants which received gas at unprofitably low prices under long term contracts. We disagree. The most obvious motive for the course of action LP & L alleges is that United/Pennzoil wished to avoid these unprofitable contracts. Moreover, the record shows that in the curtailment proceedings before the FPC, United orginally proposed that gas delivered to customer like LP & L who used it to generate electricity for domestic use be given priority over other boiler fuel uses of gas. Apparently it was the FPC's idea to order the elimination of this so called "power plant preference".
The record also shows that United opposed proposals by its interstate pipeline customers that power plants and other direct industrial users of United's gas be curtailed completely before their deliveries were curtailed at all. If, as LP & L claims, United/Pennzoil wanted to use FPC curtailment to avoid unprofitable contracts with power plants and thereby increase more profitable sales to those other pipeline customers, they would have welcomed this proposal instead of opposing it. We recognize that United/Pennzoil also proposed that the FPC increase the price their direct industrial customers paid for curtailed gas. However, this proposal was rejected by the FPC and LP & L never paid more than the contract price for any of the gas it received from United/Pennzoil. In any event we do not feel this proposal shows an intent to unreasonably restrain trade; rather, as we found in our original opinion, "... it tends to show an intent to rewrite United's contract with LP & L and other power plants by the use of Federal regulations."
It is significant that under its 1952 contract with LP & L, United had the exclusive right to supply all of the gas requirements at Ninemile Point until 1975. LP & L's expert witness, Professor W. Lovett, testified that in his opinion the 1968 renegotiation of the 1952 contract was carried on in good faith, and that United intended to honor it. The trial judge must have agreed with this witness' evaluation of the negotiation and execution of this contract, notwithstanding the evidence LP & L presented in an attempt to show that Pennzoil/United conspired to create a gas shortage in order to create a market for fuel oil and increase the price of natural gas. Our review of the record has not convinced us that the trial court's conclusion in this regard was manifestly erroneous.
Once it is accepted that the 1968 contract was made in good faith, a major premise of LP & L's anti-trust case fails for the simple reason that United/Pennzoil's subsequent acts could not restrain trade in the market defined by LP & L (the Ninemile Point area). The "trade" in that market (the negotiation and signing of long term supply contracts) had already taken place. Under these circumstances, it is more reasonable to view United/Pennzoil's subsequent actions as attempts to get out of a deal they no longer found attractive. As *1056 we observed in our original opinion in this case:
The evidence which LP & L presented in support of this claim is open to more than one interpretation. Much of it is concerned with the shift in jurisdictional status of the gas being supplied to LP & L. In our opinion, the evidence does not show that United/Pennzoil's efforts in this area actually excluded competition or were intended to do so. Rather, it tends to show an intent to rewrite United's contract with LP & L and other power plants by the use of federal regulations. These actions may raise breach of contract issues, but they do not provide a sufficient basis for imposing antitrust sanctions.
Our reconsideration of the record has not changed this opinion. If anything, it has reinforced it. We recognize that many factual conclusions in anti-trust cases must be inferred from data and statistics and cannot be proved directly. However, there must be some reasonable basis for such inferences. We find, as the trial court must have found, that LP & L's evidence did not provide a sufficiently reasonable basis for the inferences it wishes the court to draw. Although the record shows that United may have contributed to or even caused its gas shortage by unwise business practices, and may even have suppressed this information to avoid potentially adverse regulatory restraints and customer reaction, we are not convinced that those activities resulted in, or were intended to result in an unreasonable restraint of trade.
LP & L's proof of a connection between United and Pennzoil activites and the proper functioning of the marketplace as a whole (as opposed to LP & L in particular) was, in our opinion, too remote and speculative to support an award of treble damages under La.R.S. 51:122. We agree with the trial court's conclusion that LP & L failed to prove its anti-trust claims by a preponderance of the evidence and therefore affirm the dismissal of those claims under C.C.P. Art. 1672(B).
Costs of this appeal are to be paid by LP & L.
AFFIRMED.
GARRISON, J., dissents with reasons.
GARRISON, Judge, dissenting.
I dissent for the reasons discussed in my original concurrence. See: La. Power & Light v. United Gas Pipe Line, 478 So.2d 1240 (La.App. 4th, 1985) at pages 1250-1264, inclusive.
I believe that there exists upon the face of the record, a clear and undeniable unreasonable restraint. I would award treble damages, specifically the amount of $184 Million dollars and I would allow the City of New Orleans, the State of Louisiana, Jefferson Parish, the City of Monroe and every other city and parish in the State to recover their share.