### THE ADAH.

#### Appeal of BEER, SONDHEIMER & CO. et al.

(Circuit Court of Appeals, Second Circuit. April 16, 1919.)

No. 156.

1. SHIPPING ⊂⊃126—DISCHARGE OF CARGO—NEGLIGENCE OF CONTRACTING STEVEDORE.

A stevedore, contracting to discharge a ship into lighters or scows, although his contract does not include trimming cargo, is bound to stop work, if and when it becomes unsafe to continue loading without trimming, and is liable to third parties injured, if he proceeds.

2. SHIPPING ⊂⊃126—NEGLIGENCE IN DISCHARGING—LIABILITY FOR INJURY TO VESSEL.

A cargo owner, who has agreed to discharge the vessel, is not liable as principal for negligence of a stevedore with whom he contracts for such discharge, but is liable on his contract with the vessel for any injury to her resulting from such negligence.

3. SHIPPING ⊂⊃209(1)—PROCEEDING FOR LIMITATION OF LIABILITY—PERSONS BOUND BY DECREE.

Parties to a proceeding for limitation of liability, who voluntarily ap-

---

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

pear or, after they are brought in, whether rightfully or not, join issues with petitioner and between themselves, and litigate questions of liability, are bound by the decree.

Appeal from the District Court of the United States for the Eastern District of New York.

Petition of Charles A. Fox, owner of the deck scow Adah, for limitation of liability. From the decree Beer, Sondheimer & Co. and Brady & Gioe, Incorporated, appeal. Affirmed.

In April, 1915, the petitioner, Fox, owned the scow Adah. This vessel is the usual type of harbor deck scow, 94 feet long on the flat bottom, 112 feet over all, 33 feet beam, 10 foot side, and 22 inches sheer. She was to carry all her load on deck, and was calculated to be "decks to" with about 765 tons aboard. The scow herself displaced (i. e., weighed) 193 tons light (this is the average of experts' calculations) on a draught of 26 inches. The Adah was launched in December, 1914, and lay at the builder's yard until the latter part of April, 1915, when Fox chartered her to Jacobus et al., knowing that she was to be used to lighter ore, from alongside a steamer.

Beer et al. owned a large lot of ore or "copper concentrate" (a sticky clayey substance that will not run and distribute itself like sand or crushed stone) on the steamship Uller. With them Jacobus contracted to transport this ore, from alongside the Uller to its ultimate destination, but he did not undertake either the loading, discharging, or trimming of the cargo. Beer et al. contracted with the stevedoring concern of Brady et al. to load the lighters furnished by Jacobus, but the stevedores were not paid for trimming. They had offered to load at 20 cents a ton, or load and trim at 23 cents. The lower figure was accepted, and work began with no bargain or arrangement as to trimming, specifically or explicitly made with anyone by Beer, who made all the contracts looking to the transport of the concentrate from alongside the Uller to its delivery point.

Jacobus put the Adah alongside the Uller, and Brady began loading at 2 p. m. April 22d. Work proceeded night and day until 3 a. m., April 24th, when the scow had not over 743 tons on board. She was then started (stern first) from her berth alongside, and toward the bulkhead, by a line from the Uller's winch, and then hauled clear of the steamer by a line from the bulkhead. Almost as soon as her stern got into the tideway (from which the Uller previously protected her) she careened to port (or toward the tide), dumped her cargo, and turned over, striking and injuring the Uller in the process. The cargo was, of course, lost, and the Adah herself greatly damaged.

Litigation over this disaster was begun by the owners of the Uller, who sued Brady, alleging that the capsizing and consequent damage was due to negligent loading. Into this suit (in admiralty) Jacobus, Fox, and Beer were all summoned (or intended so to be) under the fifty-ninth rule, on the theory that either Beer or Jacobus was responsible as principal for whatever negligence in loading existed, or that Fox, or the Adah, or both, were liable because the loss was proximately due to unseaworthiness of the scow.

Thereupon Fox began this limitation proceeding, in which all the other enumerated parties appeared, filed claims and answered. They all joined issue with Fox by declaring the Adah unseaworthy, but Beer by answer thrust liability on Jacobus by asserting that he should have trimmed the cargo—something Jacobus denied, alleging that Brady had "assumed entire charge" of the loading, so as to keep the boat "at all times on an even keel," and further urging that in respect of proper loading Brady was Beer's agent or servant, and did load negligently.

The Uller also averred that Brady had unskillfully placed the cargo, and so contributed to disaster, while Brady denied all allegations of such negligence contained in Fox's petition, and averred that the sole cause of injury was the negligence of Fox or his agents. In some form, also, every answer contested Fox's right to limit.

The decree below (read with the opinion) holds: (1) That the Adah was seaworthy, and not negligent, wherefore neither she nor her owner is responsible for any part of the loss or damages; (2) that negligent loading by Brady was the sole cause of disaster; (3) that Beer, as the employer of Brady, was liable to the Uller; and (4) that Jacobus was not chargeable with any duty or fault in the premises. Wherefore Brady primarily, and Beer secondarily, are declared liable for "the loss of or damage to the said cargo and to the steamship Uller." Nothing is said regarding the Adah's own damages, nor is any recovery in money decreed for or against any party, except in respect of costs.

From this decree Brady and Beer appealed, both substantially demanding a new trial, and the former specifically complaining (by assignment of error) that the court below, not only found the Adah guiltless, but "held this claimant (Brady) responsible for the damages arising out of said disaster."

Geo. V. A. McCloskey, of New York City, for petitioner.

Mark Ash, of New York City, for Jacobus and others.

Chauncey I. Clark, of New York City, for the Uller.

Harrington, Bigham & Englar, of New York City, for Beer, Sondheimer & Co.

Kirlin, Woolsey & Hickox, of New York City (Robert S. Erskine and John M. Woolsey, both of New York City, of counsel), for Brady and others.

Before WARD, HOUGH, and MANTON, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). The relation of Jacobus to the other parties presents no question of law. The statement of fact prefixed to this opinion sufficiently indicates that on this point we agree with the court below. Nor does the contention that Fox has no right to limit liability require discussion. Let it be admitted that, if he had chartered to Jacobus an unseaworthy boat, he could not limit, under Benner Line v. Pendleton, 217 Fed. 497, 133 C. C. A. 349, affirmed Pendleton v. Benner Line, 246 U. S. 353, 38 Sup. Ct. 330, 62 L. Ed. 770. But that does not mean that he could not, while asserting seaworthiness, petition for the benefit of the statute; nor can it be contended that, if seaworthiness be established, he may not be declared free of liability for the injury and loss complained of.

Appellants lay much stress on the duty of petitioner affirmatively to prove seaworthiness, inasmuch as a presumption contra is said to have arisen by the admitted occurrence of accident. We do not find it necessary to consider the matter. Decision below was not reached by dealing with presumptions, nor was it rested on burden of proof or evidence. The record is very ample, and we have no difficulty in ascertaining therefrom, by a fair preponderance of credible evidence, why the Adah capsized.

We hold it proven that the scow was well built, new, of approved design, and did not leak. More particularly it is proved that lying light in winter weather at the yard did not cause her seams to open. It follows that, until she took it in over her rail, there was no more water in her than is usual in a new and well-built boat of her class.

When a tight boat capsizes in calm water, the inference is almost irresistible that her action is due to the disposition of her load. But we do not rest on the inference; it is positively proven, and by Mr. Brady himself, that no trimming was done, the material was dumped

approximately amidships, and left to "run when it got piled high enough," but only the "dry part would run." And by other witnesses it is shown that before a full load was put on the Adah the deck was awash on the port side, and she was heavy by the stern. We find that this was the reason why the 25 tons additional that she ought to have carried were never put aboard, and why she was removed from the Uller's side. We also accept the testimony that this combination of longitudinal and transverse unevenness is peculiarly dangerous, and find that the Adah was in such a condition of instability that the oscillations caused by hauling her across the tide (slight as they must have been) were enough to tip her over.[1]

[1] Under Boret v. Robert R., 255 Fed. 37, —— C. C. A. ——, the stevedores were held primarily liable for the damage resulting from such bad loading. It was there held that a stevedore, under exactly the same contract as is here admitted, was bound to stop work when and if it became unsafe to continue loading without trimming. He may call on his principal or employer to do the necessary work (in The Robert R., the steamship; in this case, the cargo owner), but he proceeds in a work endangering others at his individual peril; and the fact that his paymaster, when engaging him, economized by refusing to pay for trimming, does not relieve the stevedore who loads badly (i. e., out of trim), and though it may emphasize it does not cause any liability to third parties, on the part of the economic employer.

[2] In this case Brady (like the stevedores in The Robert R., supra) is an independent contractor, the relation of principal and agent does not exist, nor was the work contracted for inherently or necessarily dangerous. The ship in The Robert R. was liable for lost cargo as a carrier; i. e., in contract. In this case Beer is responsible contractually to the Uller for negligence in carrying out his agreement to remove the cargo from her hold and safely put in overside.

---

[1] The record contains much scientific or mathematical evidence which has not been overlooked. The effort was to demonstrate that such a vessel as the Adah, with no greater inclination than was testified to by extremely unscientific observers, could only capsize through action of free water in the hold—because her métacenter, when careened as stated, must have remained several feet (calculations vary) above the center of mass or gravity. The witnesses doubtless testified fairly from the data furnished. But we think it was always assumed that the load was symmetrical (i. e., that on an even keel the center of mass was in the same vertical as the center of buoyancy), and no allowance was made for the effect of water coming over the deck—though one witness (Mr. Kindlund) admitted that such event would make against stability. Any water over the deck edge "diminishes resistance to inclination." The Royal Sceptre, 187 Fed. 228.

As this vessel was loaded heavily to port, it is obvious that misplaced weight on deck could produce the same result as free water in the hold, while as soon as the cargo began to slide the situation would be aggravated. It may be true, as estimated by Mr. Rodemund, that the entire cargo would not spill until a heel of 45 per cent. was reached, but, with one side under water, that inclination would speedily be reached, through partial slides of cargo and the downward pressure of water above deck level.

For a simple statement of the problems of buoyancy and stability (with special reference to vessels of rectangular cross-section), see "Naval Construction" by R. W. Meade, U. S. N.

We have before us no pleading or decree claiming or adjudging liability on Beer's part for the Adah's damages. For them on this record Brady is responsible; further we express no opinion.

[3] Appellants finally allege error in decree below, because it not only absolves the Adah from blame, but fixes upon Brady and Beer responsibility for the loss and injury in respect of which the Adah filed this petition.

Whether it was necessary, in absolving the Adah, to fix blame on some one else, is a question we need not decide. Nor are we concerned with the inquiry whether the court could have compelled some of the parties to this appeal to come into the limitation proceedings. It is enough that they did come in, and made parties of themselves. Some of them (perhaps) came in voluntarily, but (as hereinbefore shown) all deliberately raised issues with each other, as well as with the petitioner, Fox, and litigated those issues at great length.

Having become parties, they are bound by the decree entered in the suit wherein they are parties.

"Parties in the larger legal sense are all persons having a right to control the proceeding, to make defense, to adduce and cross-examine witnesses, and to appeal from the decision if an appeal lies."[2]

All the persons, firms, and corporations before this court in this matter fully respond to this definition. How or why they became parties is immaterial; they have had their day in court, and their relative rights have in substance been properly adjudicated.

The decree appealed from is affirmed. The only costs allowed will be the costs of this court to the petitioner, Fox, and against the appellants.

[2] This definition from Greenleaf on Evidence has been approved in Green v. Bogue, 158 U. S. 503, 15 Sup. Ct. 975, 39 L. Ed. 1061, and substantially adopted in Ashton v. Rochester, 133 N. Y. 193, 30 N. E. 965, 31 N. E. 334, 28 Am. St. Rep. 619.

The action brought by the Uller is still pending in the Southern district of New York. If the action of some of the parties there impleaded in appearing and answering to this limitation in the Eastern district be thought voluntary, see Straus v. American Publishers' Ass'n, 201 Fed. 310, 119 C. C. A. 544.