THE BENTON COAL MINING COMPANY, Plaintiff in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(J. P. CHEAT-WOOD, Defendant in Error.)

*Opinion filed April 23, 1926.*

1. WORKMEN'S COMPENSATION—*method of review is statutory and must be strictly followed.* The right to review the decision of the arbitrator under paragraph (*b*) of section 19 of the Compensation act is entirely statutory, and as the method provided by the statute is *sui generis,* a party seeking such review must strictly follow the statute.

2. SAME—*when a nunc pro tunc order of commission is void.* The Industrial Commission has no authority or jurisdiction to enter an order *nunc pro tunc* after the expiration of the time allowed for filing a petition to review the decision of the arbitrator, reciting that a petition had been filed in apt time and that the party is entitled to a review, when, in fact, the petition referred to in said order was never filed, as a *nunc pro tunc* order is only for the purpose of making a record speak the truth and not to make a record of facts which do not exist.

3. SAME—*formal pleadings or petition is not required before Industrial Commission.* No formal pleadings of any character are required in the practice before the Industrial Commission, and no formal petition, in the sense of such a petition in a court of law, is required either before an arbitrator or before the commission on review of the arbitrator.

4. SAME—*what is a sufficient petition for review of decision of arbitrator.* The term "petition," in paragraph (*b*) of section 19 of the Compensation act, providing for a review of the arbitrator's decision by the Industrial Commission, means any informal application or request in writing signed by the party who is required to file the same or by his attorneys for him, and a letter signed by the attorneys of the petitioner informing the commission that the party desires a review in a case named, with a request for a proper copy of the evidence before the arbitrator or for a stenographic report, is sufficient if filed in apt time.

5. SAME—*when award for permanent total disability is not sustained by evidence.* An award for permanent total disability is not sustained by the evidence where the preponderance of the evidence shows that the injured employee, who was a coal miner, had so improved at the time of the hearing before the Industrial Com-

mission that he was able to do light work, as such proof does not establish total and permanent disability within the meaning of the statute, although the expert testimony indicates that he will never be able to do manual labor.

WRIT OF ERROR to the Circuit Court of Franklin county; the Hon. JULIUS C. KERN, Judge, presiding.

WILLIAMS, LEWIS & COFFEY, for plaintiff in error.

A. W. KERR, and A. C. LEWIS, for defendant in error.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

J. P. Cheatwood, defendant in error, on May 9, 1923, filed an application with the Industrial Commission for compensation against the Benton Coal Mining Company, plaintiff in error, for an injury received by him December 20, 1922, while engaged in loading coal for said company. He received an electric shock, causing an injury to his back and arms. The arbitrator awarded him compensation at the rate of $17 per week for twelve weeks for temporary total incapacity and refused to award anything for permanent disability. The decision of the arbitrator was reviewed by the Industrial Commission, and an award was entered in favor of defendant in error for $17 per week for 250 weeks and thereafter a pension for life of $28.33⅓ per month. The decision of the commission was confirmed by the circuit court of Franklin county, and this court allowed a writ of error for a review of the record.

It was stipulated before the arbitrator that the injury arose out of and in the course of the employment of defendant in error; that notice of the injury and demand for compensation were made in apt time; that the annual earnings of petitioner for the year preceding the injury were $1456 and that the average weekly wage was $28, and that plaintiff in error and defendant in error were on the date of the accident operating under and subject to the provisions of the Workmen's Compensation act. The only ques-

321—14

tion in dispute was the extent of the injury to defendant in error and the number and ages of his children.

The decision of the arbitrator was received by the defendant in error June 28, 1923. The proof in the record shows that on June 30, 1923, his attorneys mailed to the Industrial Commission at the City Hall Square building, Chicago, Illinois, a petition for review of the decision of the arbitrator, which was enclosed in a properly stamped envelope, with a letter to the commission advising it of the enclosure of the petition. On July 5, 1923, the said attorneys wrote and addressed a letter to the commission in which they referred to the fact that they had previously mailed the petition for review in said cause, and therein asked the commission to have their reporter to prepare the transcript of evidence and that they would remit for the same upon a receipt of a statement. This letter addressed to the commission appears in the record and bears the stamp or file-mark of the Industrial Commission reciting that it was received July 6, 1923. On July 12, 1923, the attorney for defendant in error received a letter from the commission acknowledging receipt of letter of July 5 and stating that the original petition could not be located. On August 16, 1923, the commission entered an order finding that such petition for review had been mailed by defendant in error within the required time to the commission and that through no fault of him or his attorney petition had been lost or mislaid, and that the application of the defendant in error to file with the commission the said original petition, or a copy thereof, as of date July 2, 1923, be allowed. Notice of the hearing on review was given to plaintiff in error, and it appeared by attorneys, limiting its appearance before the commission for that purpose only, and filed its motion to dismiss the petition for review, alleging as grounds therefor that it had not been filed with the commission within fifteen days after the receipt of the decision of the arbitrator; that the commission had no jurisdic-

tion or authority to allow the defendant in error, by its *nunc pro tunc* order, to file the said original petition of the defendant in error or copy thereof, and that the decision of the arbitrator became legally the decision of the Industrial Commission. This motion of the plaintiff in error was denied and it thereafter took no part in the hearing before the commission. Defendant in error introduced additional evidence, on which the commission entered its award aforesaid.

Paragraph (*b*) of section 19 of the Workmen's Compensation act provides that unless a petition for review is filed by either party within fifteen days after the receipt by said party of the copy of the decision of the arbitrator, and unless the party petitioning shall, within twenty days after the receipt by him of the copy of the decision, file with the commission an agreed statement of the facts appearing upon the hearing before the arbitrator or a correct stenographic report, the decision of the arbitrator shall become the decision of the Industrial Commission. The right to review under said section is entirely statutory, and this court has held that the method provided by the statute is *sui generis*, and that in order for a party to obtain a review of the decision of the arbitrator by the commission the statute must be strictly followed. (*People* v. *Andrus*, 299 Ill. 50.) The commission had no authority or jurisdiction to enter the *nunc pro tunc* order of August 16, and for the reason that the commission had never received the original petition, or a copy thereof, within the fifteen days required by the statute. The office of a *nunc pro tunc* order is for the purpose of making the record show it as it should exist if the proper authorities making the record had done their duty in correctly making the record. In other words, its office is to cause the record to speak the truth. The *nunc pro tunc* order in this case does not speak the truth. It proceeds on the theory that the record should show that defendant in error had filed the said original petition in

apt time or was entitled to have it filed in apt time, neither of which is true. If the petition had been lodged with the commission in apt time but was not properly stamped or shown to be filed in such time then the *nunc pro tunc* order would have been properly entered. The order of the arbitrator legally became the order of the commission if the defendant in error did not, in fact, petition the commission for a review and lodge his petition with the commission within fifteen days, as required by the statute, because the objections and motion of the plaintiff in error were not waived by plaintiff in error but were strictly adhered to by it. *Pocahontas Mining Co.* v. *Industrial Com.* 301 Ill. 462; *Gould Construction Co.* v. *Industrial Com.* 311 id. 472.

The attorneys for defendant in error contend that their letter to the commission of July 5, 1923, is a sufficiently prepared petition, under the statute, to give the Industrial Commission jurisdiction to review the decision of the arbitrator. The two things that are jurisdictional for such a review by the commission are the filing of "a petition for review" by the party desiring such review within fifteen days after the receipt by such party of the copy of the arbitrator's decision and notification of time when filed, and the filing by him with the commission either an agreed statement of the facts appearing upon the hearing before the arbitrator or committee of arbitration, or a correct stenographic report of the proceedings at such hearing, within twenty days after the receipt by him of the copy of said decision. The statute also provides that the Industrial Commission may, for sufficient cause shown, grant further time, not exceeding thirty days, in which to petition for such review or to file such agreed statements or stenographic report. Such extensions of time should be made before the original time allowed in each case has expired. It does not appear in this case that the stenographic report was filed within the time required in the statute, but no objection was made by the plaintiff in error to the effect that it had

not been so filed, and this ground of objection not having been urged in its motion to dismiss was waived. So the real question in this record in the first instance is whether or not the letter aforesaid is a sufficient petition, under our statute, to give the commission jurisdiction to review the arbitrator's decision. The statute nowhere prescribes any requisite whatever for such a petition. It is merely referred to in the foregoing paragraph as "a petition for a review." The statute does not provide that any petition shall be filed before the arbitrator. If there are any rules made by the Industrial Commission as to what the petition for a review of the arbitrator's decision must contain we are not advised of such rule, and there is no complaint in this record that a rule of the commission in that regard is violated. Under the provisions of paragraph (*e*) of section 19 the requirement is that the Industrial Commission shall review promptly the decision of the arbitrator or committee of arbitration and all questions of law or fact which appear from said statement of facts or stenographic report, and the additional evidence submitted by the parties, if a petition for review and agreed statement of facts or stenographic report is filed, as above provided, and after such hearing upon review the commission shall file in its office its decision thereon and shall immediately send to each party or his attorney a copy of such decision, etc. It appears from this paragraph that there is no special significance attached to the petition as to what it shall contain or does contain. The decision of the commission is based solely upon the review of the decision of the arbitrator or committee of arbitration and all questions of law or of fact submitted, if "a petition for review," etc., is filed "as provided herein."

No formal pleadings of any character are required by the statute or by this court in the practice before the Industrial Commission. This court had occasion to notice heretofore that no formal petition, in the sense of a formal

petition before a court of law, is required either before an arbitrator or before the commission on review of the arbitrator. We have indicated in some of our decisions that if there is such a petition that it should not be inconsistent with the findings of the arbitrator or the commission, and we have also indicated that the Industrial Commission has authority to make rules as to what such petitions should contain when filed. This is the extent, as we believe, that this court has gone in our indications as to what such a petition should contain. The word "petition" is usually and ordinarily defined as a request or application in writing or printing, or it may be a verbal request or application. As applied to legal procedure a petition is ordinarily defined as a formal request or application in writing made to a court requesting judicial action of some character and usually signed by a litigant or by his attorneys for him. The term "petition," as used in our Compensation act in the section aforesaid, we think may be very correctly defined as an informal application or request for review in writing signed by the party who is required to file the same or by his attorneys for him. We think that any petition that simply informs the commission that the party desired to have a review of the decision of the arbitrator in a certain named case, which is in writing and signed by the party or by his attorneys for him, with a request for a proper copy of the evidence before the arbitrator or a stenographic report, would be amply sufficient for all purposes to give the Industrial Commission jurisdiction for such review, if filed in time or within such further time as is given by the statute on application for such extension in proper time. The letter in this case above referred to informed the commission, in writing, that a few days previous thereto the attorney had mailed a petition to it for review in the case of *In re J. P. Cheatwood* v. *Benton Coal Mining Co.* 57846. The attorney further informed the commission that he did not, in his first letter enclosing the petition, order the record writ-

ten up. The letter then closes, "Kindly have the reporter prepare the transcript of the evidence and I will remit upon receipt of statement." This letter was signed by the attorney for the defendant in error and disclosed that his post-office address was Benton, Illinois, and the letter bore date of July 5, as aforesaid, and was filed by the commission as already stated. This letter clearly makes known to the commission that the defendant in error had asked previous thereto, and was by the letter still asking, for a review of that case and for a transcript of the evidence in that case, which he offered to pay for upon a proper statement of the cost. If the defendant in error's attorney had in the first instance before the Industrial Commission taken the position that this letter was amply sufficient as a petition for review to give the commission jurisdiction for such review, and had asked leave to amend such petition to make it more formal, we have no doubt that the commission would have had jurisdiction to grant such an order. We think, also, that a motion would have been properly overruled to strike the letter from the record, with its file-mark on the back thereof, if such a motion had been made by the plaintiff in error, and for the reason that the letter might be regarded as a petition for review and jurisdictional. We therefore hold that there was a sufficiently formal petition for review before the commission and filed in apt time, and that the commission thereby obtained jurisdiction for such review, and that the void order aforesaid entered by it, or its *nunc pro tunc* order, did not have the effect to take away or lose the jurisdiction of the commission. In the making of this decision we have followed the Supreme Court of Michigan in two of its decisions, the first of which is very applicable to this case, as it is based upon facts very similar to this case. The statute of Michigan for review of the arbitrators' decisions, while different in language, is substantially analogous to ours. The decisions to which we refer are *Jones* v. *St. Joseph Iron Works,* 180

N. W. 374, and *Kalucki* v. *American Car and Foundry Co.* 166 id. 1011.

The following is the substance of the testimony of J. P. Cheatwood before the arbitrator: Have not worked any since this injury. Was loading coal and was injured by coming in contact with an electric machine wire. The wire struck him on the back of the head and on the left wrist, "stuck" to him and held him up and burned him. He became unconscious and remained so until they had carried him more than a quarter of a mile to the roundhouse. He remained in the hospital at Benton for eight days and was then taken home. Before the accident he could do any kind of work. Had been working in the mines for five years. The injury has affected his head. It seems solid and too heavy and hurts him all the time. When he walks a little distance his head gets so bad he has to stop. His legs seem to be drawing and his arms and leaders get stiff and his arms don't move properly. They don't hurt so bad now, only at times. He could read before he was injured but cannot read much now because his eyes are affected by it. The foregoing is about all the effect the injury had on him. He spit up blood and blowed some blood out of his head about the first of January, and the injury affected his breathing, and when he gets tired his heart begins "to flutter." He could pick up a hundred pounds and "shoulder it" before he was injured, but does not think he could pick up twenty-five pounds now. He is gaining in flesh and at times he can "pick up and go," but he cannot go far. He thinks he is a little better than he was a month ago. He has not tried to do anything since he was injured except to plow, and had to quit that because of a hurting in his back and hips. He feels weak and has no energy and vim. He worked in three coal mines in Alabama and his home is in Alabama, where he has a farm of eighty acres and wife and five children under sixteen years of age. He was injured in the mines at Warrior, Alabama, twenty-nine years ago while

driving cap-boards in a soapstone top, and soapstone fell on his back and knocked him down.   He again repeats that he thinks he is mending some and has a little more strength.

Drs. Turner, of Christopher, and Gilmore, of Benton, Illinois, testified that they made X-ray examinations of defendant in error in February, May and June of 1923 and that they make such examinations of patients regularly. Dr. Turner made a physical examination of him and a fluoroscopic examination of his heart, aorta and his lower lumbar and pelvic regions.   This examination showed a fusiform dilation of the ascending aorta, which he stated was no doubt an aneurism, and that an enlarged aorta in sudden movements had the effect to produce pressure sometimes, which has vague symptoms, and at times coughing and irregular heart beats and irregular breathing.   He found that upon slight exertion his pulse became rapid and irregular, and he has some rales of the lungs.   The X-ray picture of the lumbar spine disclosed an old fracture of the second and third lumbar vertebræ, healed and calloused, causing some slight limitation of motion.   He also found scars in the back of his head, in his left arm and interior portion of his left wrist and elbow, and in the posterior portions of his right arm, and some in his back.   Most of the scars seemed to be old scars.   There were a few that seemed to be recent.   He received a history of his recent injury from Cheatwood.   He stated that an electric shock produces violent spasms of the muscles,—the heavier the charge the more violent the spasms.   He gave it as his opinion that the violent contraction of the general skeletal muscle, as well as the musculature of his viscera, produced such force as to cause a dilation or aneurism of the aorta with an encroaching of the lungs, which has produced his present condition, which in his judgment was permanent.   He also stated that in his judgment Cheatwood was not able to do heavy manual labor.   His statement that he is improving does not influence his answer.   The doctor also stated that

Cheatwood was improving in weight and in his lung condition. He did not know his physical condition at the time of his injury and before his injury. He also stated on cross-examination that he found pain in his back, which was due to arthritis of long standing,—several years,—and that the pain and soreness he complains of in his back is due to the arthritic condition. His general physical appearance is not good. His muscle tone is fairly good and he is a well-nourished man. His pupils re-act to accommodation and light. His injury to his back produced a prominence of the spinous processes of the second and third vertebræ, and his spine is rigid and a little straighter than normal and has some influence in his ability to work. In his judgment he could do some work in a coal mine, such as trap or watch a door. He based all his opinions on the history of the case he got and physical findings. His examination was not for treatment.

Dr. Gilmore's first X-ray examination of Cheatwood was of the lumbar spine and sacro-iliac, and his last examination was of the lumbar spine alone. He made no physical examination of the applicant. He found a marked compression of the body of the first lumbar vertebra on the right side and the third on the left side, with dense bone production from the first to the third vertebræ on the right side; osteo-arthritis between the last dorsal and the first lumbar on the right side and between the third and fourth vertebræ on the left side; an old transverse fracture of the right transverse process of the fourth lumbar, and solid union, without displacement; some calloused absorption in the inferior angle on the left side, with production in the same region on the right side, and no X-ray evidence of any recent trauma. He stated that aneurism is a pathological dilation of the blood vessels, which can be demonstrated on an X-ray plate. He did not attempt to demonstrate any aneurism. He expressed no opinion as to the ability of Cheatwood to perform manual labor.

Dr. J. B. Moore, of Benton, testified that he made a thorough physical examination of Cheatwood on March 12, 1923, and had previously observed him in the hospital and after he was up and around. He found his general appearance to be good, his height five feet and seven and three-quarter inches and his weight 172 pounds, stripped. He is well nourished and developed. The musculature of his arms, shoulders, back, thighs and legs is unusual and he is unusually well developed. His muscles are well rounded out, show good tone and have the appearance of unusual strength. He has a scar in the occipital region, where there was a scalp wound approximately an inch long. There is nothing of importance in his scalp. His pupils are equal and re-act to accommodation and light. When examined he exhibited a fine intentional tremor of the extremities, by which is meant that when the intention of Cheatwood was directed from one extremity to another the tremor ceased and appeared to be voluntary. There is nothing in the hands, wrists or forearms. The arms show good development. His chest is well formed and his expansion approximately an inch and a half. The breathing sounds are normal throughout, the heart tones are regular, rate eighty-five standing, and no enlargement. His systolic blood pressure is 125. He states that all the findings are normal; also, that he has a prominence of the spinal processes in the upper lumbar region, which was determined to have been the result of an old injury. There are no acute findings in the back and there hasn't been any at any time. The muscles are soft in the upright positions and there is no undue tenseness in the muscles of the back. There is fixation of the segments involved. Stooping and regaining does not bring out any back spasms. There is no atrophy either in the back muscles or the buttocks. The abdominal wall is good. There is nothing unusual recognized in the thighs or legs or any of the joints or the superficial or deep reflexes. He gave it as his judgment that Cheatwood was

able to work on March 12 at any kind of work. He stated that there was no aneurism present and not a single finding to indicate it. He gave him another thorough physical examination on June 5, 1923, and found him to be well nourished and his weight 174 pounds, stripped. In that examination he went more into the skeletical muscle condition, as he complained of weakness and drawing in the muscles. He found that they were all unusually well developed and showed good tone and no atrophy from non-use. He examined his chest and heart and found nothing abnormal. He again expressed his opinion that Cheatwood was able to work at any kind of work whatever.

The additional testimony before the Industrial Commission was given by two fellow-laborers of Cheatwood, two physicians, and that of himself. The two laborers testified, in substance, that they saw Cheatwood come in contact with a No. 40 machine, uninsulated, charged wire. The back of his head was on the wire, and they noticed that his eyes bulged and his tongue lolled, and one of them kicked him away from the wire and he fell across the rails, with his head down. They picked him up and carried him out of the mine. He was stiff, and when they used artificial respiration on him for a few minutes he began to breathe. When he regained consciousness he fought the motorman and those around him. He remained stiff and his bowels seemed to break away.

Dr. Haney, of Centralia, and Dr. Adams, of Oak Park, Cook county, examined X-ray plates made of the applicant by Dr. Haney, which showed, according to Dr. Haney, a complete ankylosis between the second and third and the third and fourth lumbar vertebræ, with the inter-vertebræ spaces nearly obliterated, and there was a marked bony formation between the second and third lumbar vertebræ on the right side and a very noticeable angulation of the lumbar spine on the left, the second and third lumbar vertebræ being an inch out of line, and a very pronounced rota-

tion of the lumbar spine on the right. There were a few concretions of the pelvis. He did not see any pathology of the chest, except a slight enlargement of the heart. These conditions are of traumatic origin and are permanent, and in his judgment Cheatwood is unable to and will never be able to do heavy manual labor. Dr. Adams also stripped Cheatwood and found his weight to be 182 pounds, his urine normal, his blood pressure 110 systolic, 90 diastolic, and his hemoglobin eighty per cent normal. His reflexes were very much reduced, and his body, head and arms showed tremor, which was very marked in his legs when manipulated. The electrical current showed normal reactions in the upper part of his body. The muscle mass on his back was markedly stiff and rigid in the lumbar regions. His eyes show normal reflexes, with some impairment of sight, due to age and not to injury. He described the conditions of his back and lumbar vertebræ and general conditions in that region very similarly to that of the other physicians, and gave it as his judgment that they might, and could with reasonable certainty, have been caused by the contact with the electric wire and his fall on the steel rail. He also gave it as his judgment that he would never be able to do heavy manual labor.

Cheatwood testified that he was in no better condition then than he was when examined before the arbitrator; that his back and legs are weaker and that he has done no work of any kind since the hearing before the arbitrator, and that there is no manual labor that he can do. The award in this case was for permanent and total disability, which means that he is totally incapacitated for earning wages under any employment. In our opinion the evidence does not show that he is incapacitated from doing light work and earning wages. There is no testimony in the record that he cannot perform light work at any calling but does show that he is incapacitated from doing heavy manual labor. Every physician who expresses opinion upon the subject

gave it as his judgment that he was capable of doing light work, and the evidence clearly shows, to our mind, that he is able to do light work, even in the mines. The preponderance of the evidence shows, we think, that his condition is improved, notwithstanding the fact that he positively states that his condition has grown worse. He has increased in weight, and the testimony convinces us that he is not totally and permanently disabled within the meaning of the statute.

The judgment of the circuit court is reversed and the cause is remanded to the court, with directions that it be remanded to the commission for a further hearing after setting aside its award.

*Reversed and remanded, with directions.*