**TEX–O–KAN FLOUR MILLS v. UNITED STATES.**
Civ. A. No. 801.

District Court, N. D. Texas, Dallas Division.
March 15, 1943.

Callaway & Reed, of Dallas, Tex., for plaintiff.

Robert L. Pierce, Asst. to Atty. Gen., Daniel W. Knowlton, Nelson Thomas, Jack Garrett Scott, and Hallan Huffman, General Counsel, I. C. C., all of Washington, D. C., for defendant.

Before HUTCHESON, Circuit Judge, and ATWELL and KENNERLY, District Judges.

ATWELL, District Judge.

The plaintiff, a Delaware corporation, has its general office and place of business in Dallas, Texas. It is engaged in the business of buying and selling grain and operating mills for the conversion of grain. In the selling of American, Argentina and Canadian grain, it is in competition with similar business institutions throughout the United States, but particularly with those located in Buffalo, Chicago, Minneapolis, Kansas City, New Orleans, and the gulf ports.

It alleges that wheat and barley grown in Canada has always moved and now moves in bond in railroad transportation from Canada across the United States to consuming centers in the West Indies, Central America, South America, and the Republic of Mexico. There has been a movement of rice from Mexico into Canada and it is now so moving. Cotton and peanuts move in all rail transportation from Mexico to Canada, across the United States.

That the normal movement of wheat into Mexico is from five to eight million bushels per annum, equalling three thousand to five thousand loaded box cars. Due to unusual conditions, this demand has increased to ten million bushels, equalling sixty-five hundred loaded box cars.

That the normal movement of grain and its products in such producing sections of the United States and Canada to the West Indies, Central America and South America, is from fifteen to twenty million bushels per annum, equalling approximately ten to fourteen thousand loaded box cars.

The normal route from Canada has been via water to Buffalo, Chicago, and Minneapolis, thence via rail to Atlantic gulf ports, and thence via steamship to destination. Also, a normal movement of grain and its products from Canada by way of railroads across the United States to gulf ports.

Due to the shortage of boats and of coastwise service, as a result of the World War, the normal route for grain produced in the United States and in Canada to the Latin American countries has been materially disrupted and the movement has been diverted to all rail routes.

That on or about February 15, 1943, there was in storage at Buffalo 2,404,000 bushels of Canadian wheat for the purpose of moving across the United States to the said countries. That the movement to Mexico has been increased due to the policy of the American government. That this is well known to the Department of

Agriculture, the I. C. C., and the office of Defense Transportation.

Early in August, 1942, the Department of Agriculture was informed of the increased needs of Mexico for wheat, and plaintiff and many of its competitors sought to supply such need, sealed bids being made early in December. Such bids covered Canadian grain and American grain. The plaintiff's bid for 2,600,000 bushels was accepted by the Republic of Mexico on December 17, 1942, it having on hand at that time 600,000 bushels at the port of Galveston, which left 2,000,000 bushels to move from Canada.

That it consulted the railways with reference to such movement from Canada without involving in any way the transportation of war materials for the United States. That the railways advised it that they had available surplus box cars and motive power and that no shortage would be created by this movement, and the contract was entered into for the sale of such grain.

That the sale price of American grain is controlled by the loan policy of the C.C.C., an agency of the Department of Agriculture.

It then pleads the prevailing price for Canadian grain, and for American grain, showing how that resulted in the sale of the Canadian wheat to Mexico, and that plaintiff really preferred to buy and sell American wheat and had repeatedly called the attention of the Department of Agriculture and government officials to the situation.

That upon completion of the deal, the plaintiff notified the railroads and they begun the movement of empty box cars into Canada for the transportation thereof. On January 12, 1943, the defendant, I. C. C., issued service order No. 103 in the following words to-wit:

"At a session of the Interstate Commerce Commission, Division 3, held at its office in Washington, D. C., on the 12th day of January, A. D. 1943.

"It appearing, That an unusual movement by railroad of grain, in carloads, from points in a foreign country through the United States to points in another foreign country may result in shortage of railroad equipment and congestion of traffic, and that the office of Defense Transportation has requested this Commission to take action in the matter; and that an emergency exists requiring immediate action;

"It is ordered, That:

Title 49—Transportation and Railroads

Chapter 1—Interstate Commerce Commission

Subchapter A—General Rules and Regulations

Part 95—Car Service

"§ 95.4 Grain from a foreign country. (a) All common carriers by railroad are hereby ordered not to accept or move grain, in carloads, originating in a foreign country and moving by railroad through the United States, all-rail, to points in another foreign country; and all common carriers by railroad are hereby ordered not to furnish cars for such a movement.

"(b) Special and general permits. The provisions of this order shall be subject to any special or general permit issued by the Director of the Bureau of Service, Interstate Commerce Commission, Washington, D. C., to meet specific needs or exceptional circumstances (40 Stat. 101, sec. 402, 41 Stat. 476, sec. 4, 54 Stat. 901; 49 U.S.C. § 1(10)–(17).

"It is further ordered, That this order shall become effective immediately and shall remain in force until further order of the Commission; that copies of this order and direction shall be served upon all common carriers by railroad subject to the Interstate Commerce Act and upon the Association of American Railroads, Car Service Division; and that notice of this order be given to the general public by depositing a copy in the office of the Secretary of the Commission at Washington, D. C., and by filing it with the Director, Division of the Federal Register, the National Archives,

"By the Commission, division 3.

"W. P. Bartel, Secretary."

(SEAL)

That this particular order was directed at its transactions. The I. C. C. immediately thereafter issued certain exceptions for the benefit of others. That it applied for general and special permission to go forward but it was allowed to move only ninety-five cars. Thereupon, it petitioned for a hearing, which was denied.

That plaintiff is unable to ship by water, because of the winter season. That by

reason of its inability to obtain transportation not covered by Order No. 103, plaintiff's competitors have sold more than five million bushels of American grain to Mexico and plaintiff will lose its profit, unless it can obtain transportation.

That thereafter, on January 30, 1943, another order was issued by the I. C. C. which requires American railroads to issue embargoes so that Mexican railroads will be required to return an equivalent number of cars to the movement of American cars into Mexico.

That the result of these two orders, and of the subsidy granted by the Department of Agriculture, is that transportation is available for its competitor's movement of five million bushels of wheat sold to Mexico but such service is not available to the plaintiff.

That such orders were not issued for the purposes and reasons defined in paragraphs 15, 16 and 17 of the Interstate Commerce Commission Act, but that they were issued at the request of the Department of Agriculture, and the office of Defense Transportation, and in the interest of the C. C. C. which the Department of Agriculture owns and controls, and so that its wheat might be furnished instead of the plaintiff's.

That such orders are arbitrary, capricious, discriminatory, and, therefore, void.

That at the time Order No. 103 was issued, there was a great surplus of cars and freight motive power. That such orders will do the plaintiff irreparable injury and damage to the extent of $100,000, and both temporary and permanent restraints are prayed.

■ We recognize the suit as one pursuant to the provisions of 28 U.S.C.A. § 41(28), 38 Stat. 219. Sections 43 to 48, inclusive, of such Title, which control the same.

Service was had upon the United States and upon the I. C. C. The Director of the Office of Defense Transportation is Joseph B. Eastman, a resident of the city of Washington.

The twelfth paragraph of the complaint shows that Order No. 103 was issued at the request and on the petition of the Department of Agriculture, which is located in the same city, with Honorable Claude R. Wickard as Secretary of Agriculture.

We have not reviewed the position of the defendant. What the plaintiff says indicates a state of facts, which, if it is correct, appeals very strongly to a court. We can hardly approve of a proceeding such as has been described in the complaint. It would be wrong, of course, however, to condemn without hearing the other side, but a recital of the position of the other side is unnecessary because the I. C. C., the Department of Agriculture, and the office of Defense Transportation all move to dismiss.

■ 28 U.S.C.A. § 43 treats of the venue of such suits. It provides that, "The venue of any suit brought to enforce, suspend, or set aside, in whole or in part, any order of the Interstate Commerce Commission shall be in the judicial district wherein is the residence of the party or any of the parties upon whose petition the order was made, except that where the order does not relate to transportation or is not made upon the petition of any party the venue shall be in the district where the matter complained of in the petition before the commission arises, and except that where the order does not relate either to transportation or to a matter so complained of before the commission the matter covered by the order shall be deemed to arise in the district where one of the petitioners in court has either its principal office or its principal operating office. In case such transportation relates to a through shipment the term 'destination' shall be construed as meaning final destination of such shipment."

Since the plaintiff's petition shows that the petitioners to the Interstate Commerce Commission were the Office of Defense Transportation and the Department of Agriculture, and that each of these departments and the ranking officers thereof are residents of, and domiciled in, the District of Columbia, and not in this northern district of Texas, it seems beyond question that there is no venue in the district, and no jurisdiction here without such venue, or without a waiver of the foregoing venue statute. Home Furniture Co. v. United States, D.C., 2 F.2d 765, affirmed, 271 U.S. 456, 46 S.Ct. 545, 70 L.Ed. 1033; Skinner & Eddy Corp. v. United States, 249 U.S. 557, 39 S.Ct. 375, 63 L.Ed. 772; Hudson & Manhattan R. Co. v. United States, D.C., 28 F.Supp. 137; McLean Lumber Co. et al. v. United States, D.C., 237 F. 460; Alaska S. S. Co. v. United States, D.C., 259 F. 713; Anchor Coal Co. v. United States, 25 F.2d 462; Illinois Central R. R.

Co. v. State Public Utilities Comm., 245 U.S. 493, 502, 38 S.Ct. 170, 62 L.Ed. 425; State of Louisiana v. Morgan's Louisiana & T. R. & S. S. Co., D.C., 18 F.2d 645; 48 Corpus Juris, on "Petition"; Enderson v. Hildebrand, 52 N.D. 533, 204 N.W. 356; Benton Coal Mining Co. v. Industrial Comm., 321 Ill. 208, 151 N.E. 520.

A careful reading of the statute, and with such assistance as the foregoing authorities afford, even though the statute is somewhat clumsily drawn, shows no satisfactory way for the court to disregard its express provisions with reference to this particular question of venue. Order No. 103 is the official action of the Commission. It recites that it was entered at, and upon, the request of the Office of Defense Transportation. That must mean the "petition" of that particular activity.

At argument it was conceded that the action of the Commission was predicated upon the request of the Secretary of Agriculture, Wickard, and made known to the Emergency Commissioner Nelson, who, in turn, requested action by Office of Defense Transportation head, Eastman, who, in turn, made the position of those officers and departments known to Commissioner Johnson. The recitals of the order show that the Commission had been "petitioned" to so act. It would be a very narrow conception, it seems to us, to require that the word "petition," should have a particular form or diagram or definition. It means "an appeal," a "prayer," a "request," to act. Such appeal, request, or prayer can be in such form as to put in motion the judgment and action of the Commission. It is the final arbiter as to the form of such appeal.

It is hardly logical for the plaintiff to now claim that the parties who caused this action by the Commission are not such parties as the statute contemplates. The statute is broad enough to include any person who either by ambition, self-interest, or official duty interests himself in a car-movement situation, or a rate-making situation to the extent that he appeals to the Commission and secures an order from that body in accordance with such appeal. We cannot limit the statute to appeals by the private citizen. A representative of the people, a person acting in his official capacity as an executive in the discharge of official duty, must be included.

The plaintiff alleges that the sale of American wheat is controlled by the "governmental loan policy of the Commodity Credit Corporation, an agency of the Department of Agriculture." It also alleges that "the order was issued at the request of the Department of Agriculture in the interest of the Credit Commodity Corporation, which it now owns and controls for the purpose of selling wheat owned or controlled by the Credit Commodity Corporation in lieu of wheat sold by the plaintiff." It also alleges that that department owned approximately three hundred million bushels of wheat stored at various centers throughout the United States, and, in addition, controlled through its loans to producers, or loans through its loan agencies to producers, more than four hundred million bushels of wheat. Likewise, it alleges that, "the Department of Agriculture was authorized by an Act of Congress to maintain American wheat on a competitive basis with Canadian wheat, and, although it was instrumental in the issuance of Order No. 103, which was designed to destroy the sale of plaintiff * * *".

As distasteful as it may be to recognize that the government is using this method of placing its finger upon the private citizen's business, this court may not destroy, by reason of such dislike, the plain implications and wording of a venue statute.

It must be conceded that the Secretary of Agriculture was charged with the duty of enforcing the Acts of Congress. He was charged with the duty of the protection of the price of American grain. Whether those duties should ever have been placed upon his shoulders is quite immaterial. That is the fact. With that interest, with that duty clearly before him, with the determination to carry into effect what he conceived to be appropriate measures for the protection of the American wheat and its potential markets, he caused, by "appealing" to, by "petitioning," the Interstate Commerce Commission to grant Order No. 103 and the one that subsequently issued. He and the head of the Office of Defense Transportation are, therefore, such "parties," as fix the venue in the District of Columbia, the place of their residence.

The motion for dismissal must be granted.

HUTCHESON, Circuit Judge (dissenting).

I cannot at all agree with the majority that the government is right in the position it takes that because the order in question recites that "The Office of Defense Transportation has requested this commission to take action in the matter", the venue of this suit lies in Washington, where Mr. Eastman, the director of Defense Transportation, resides. Indeed, but for the agreement of the majority with the position of the government that the order in question must be deemed as made upon the petition of a party, I should have said that this position was not only untenable but fanciful in the extreme. The fact of that agreement has shaken a little my conviction that merely to state the position is to refute it, but it has not at all changed my view that it is demonstrably unsound. The words "upon the petition of any party" as used in the venue statute [1] are words of legal art, their meaning made luminous by legal history. With deference to my brothers, I think it clear that it does the greatest violence to that meaning to say that this order entered without the filing of a petition or the entry of an appearance by any party, as those words are used in law, was an order entered "upon the petition of any party".

I fully recognize the power of congress to fix the venue of suits against the commission as it will. I know that the statute must be construed as it has been written without regard to consequences. I, therefore, put aside, except as it is an aid to construction, the specter of the sweeping deprivation of the local venue privilege of litigant with the concentration of all venue in Washington that will follow, if an informal verbal suggestion to, or request of, the commission by any government official will fix the venue there, to go at once to the legal meaning of the statutory words.

Perhaps no two legal procedural words have had a more definite, a more consistent use and meaning than the complementary words "party" and "petition" here used. Bovier defines "petition" as an instrument of writing or printing containing a prayer from the person presenting it, called the petitioner, to the body or person to whom it is presented for the redress of some wrong or the grant of some favor which the latter has the right to give. In 48 Corpus Juris 1052, after defining "petition" generally, it is said: "In law its meaning is in no wise different, it being a formal application in writing made to a court requesting judicial action of some character. It is a term used in judicial proceedings to describe an application in writing."

In Words and Phrases, Permanent Ed., Vol. 32, pages 471–478, many quotations from opinions appear, all to the same effect, accompanied by a long list of various kinds of petitions. The diligence of the plaintiff has made available quotations from many illustrative cases dealing with the legal meaning of the word "petition".[2] If, therefore, in the venue statute invoked,

---

[1] 28 U.S.C.A. "§ 43. Venue of suits relating to orders of Interstate Commerce Commission. The venue of any suit brought to enforce, suspend, or set aside, in whole or in part, any order of the Interstate Commerce Commission shall be in the judicial district wherein is the residence of the party or any of the parties upon whose petition the order was made, except that where the order does not relate to transportation or is not made upon the petition of any party the venue shall be in the district where the matter complained of in the petition before the commission arises, and except that where the order does not relate either to transportation or to a matter so complained of before the commission the matter covered by the order shall be deemed to arise in the district where one of the petitioners in court has either its principal office or its principal operating office. * * * *"

[2] "A written application for authority to settle such controversies is a petition within the meaning of General Order XXVIII [11 U.S.C.A. following section 53], regardless of whether it be designated 'petition' or 'application.'" In re L. M. Axle Co., 6 Cir., 3 F.2d 581, 582.

"The Board held that the telegram itself was not a petition, and in this respect the Board was clearly correct." Stebbins' Estate v. Helvering, 74 App.D.C. 21, 121 F.2d 892, 893.

"The principal distinction between motions and petitions lies in the fact that motions may sometimes, if not always, be made orally, while a petition is always in writing." Gibbs v. Ewing, 94 Fla. 236, 251, 113 So. 730, 735.

"A petition is a formal written request, made to some official or body having authority to grant it." State v. School Dist. No. 2, 140 Kan. 171, 34 P.2d 102, 104.

"The basis of the ruling was that a petition is but a formal written request or prayer for a certain thing to be done, and that he who signs it must do so volun-

the word "petition" stood alone, I should have no doubt that the order in question here was not initiated on petition, but it does not stand alone. It is coupled with the use of the word "party", and the two together present a picture which cannot be mistaken of a suitor appearing in a cause by written complaint and seeking redress as a party therein. It will be noted that the legal word "party", rather than the general word "person" is here used. Of "parties", Bouvier says [Bouvier's Law Dict., Rawles Third Revision, pages 2461, 2464]: "The person who seeks a remedy in chancery by suit, commonly called the plaintiff, or complainant, and the person against whom the remedy is sought, usually denominated the defendant, or respondent, are the parties to a *suit in equity*." While at law: "There are two necessary parties to an action, viz., the person who seeks to establish a right in himself, commonly called the plaintiff, and the person upon whom he seeks to impose a corresponding duty or liability, commonly called the defendant." Words and Phrases, Perm.Ed., Vol. 31, pages 239 to 273, incl., contains a long list of illustrative quotations from cases dealing with the term "party in practice". Among these cases are Allied Drug Prod-

---

tarily; otherwise, he cannot be in the attitude of making a request." Berning v. Berning, 255 Ky. 699, 75 S.W.2d 355, 356. Also Davis v. Henderson, 127 Ky. 13, 104 S.W. 1009, 1010.

"A 'petition' is defined to be a written document which the plaintiff addresses to a competent judge, setting forth the cause of the action which he intends to bring against the defendant, and praying to be permitted to cite that defendant before him in order that he may be ordered to do or to give a certain thing." State v. American Sugar Refining Co., 138 La. 1005, 71 So. 137, 140.

"The word 'petition', as used in judicial proceedings, and uniformly, as we believe, in the revised statutes, is used to describe an application in writing, in contradistinction to a motion, which may be viva voce." Bergen v. Jones, 45 Mass. 371, 376, 4 Metc. 371, 376.

"Webster's Dictionary gives six distinct definitions of the word 'petition'. The fourth definition, which is the one applicable here, is: 'Law. A written application to a court requesting its action upon some matter therein laid before it, either interlocutory to a pending action, by way of a special proceeding, or as instituting a new action. Distinguished from a motion, which may be oral.'" State v. Schult, Mo.App., 143 S.W.2d 486, 492.

"A petition in the most general acceptation of the word means a formal request, written or printed, and signed by one or many, to be submitted to a person in authority, or to an administrative, a judicial, or a legislative body for the bestowal of some benefit or privilege, the concession or restoration of a right, the redress of a grievance, the establishment of a status, or the exercise of any power within the purview of the person or body to which it is submitted. In law its meaning is in no wise different, in that it is a formal application in writing, made by the signers thereto to a court requesting judicial action concerning some matters therein set forth." State v. Imhoff, 291 Mo. 603, 238 S.W. 122, 124.

"A petition, in common phrase, is a request in writing; and in legal language, describes an application to a court in writing, in contradistinction to a motion, which may be made viva voce." Shaft v. Phœnix Mutual Life Ins. Co., 67 N.Y. 544, 547, 23 Am.Rep. 138.

"A 'petition' is 'a formal written request addressed to an official having power to grant it.' Webster. To 'petition' requires signatures; but the Constitution makes no requirements on the part of the electors other than to state what is desired and to sign the statement." Shumacher v. Byrne, 61 N.D. 220, 237 N.W. 741, 745.

"The word 'petition,' as used in a statute, is generally understood to mean a written application, addressed to a court or judge, praying for the exercise of some judicial power, or to a public officer, requesting the performance of some duty enjoined upon him by law or the exercise of some discretion with which he is vested." Lawrey v. Sterling, 41 Or. 518, 525, 69 P. 460, 463.

"A 'petition' in common phrase is a request in writing; and in legal language describes an application to a court in writing, in contradistinction to a 'motion,' which may be made viva voce." Fenstermacher v. State, 19 Or. 504, 25 P. 142, 143.

"The word 'petition,' as used in this statute, means a formal written request addressed to an official or organized body having power to grant it, in other words, the completed document containing the petitioners' request or demand, the names of the signers thereto, their residences, dates of signing, and the verification of the one who circulated the same." State v. Wendt, 225 Wis. 10, 273 N.W. 72, 74.

ucts Co. v. Seale, Tex.Com.App., 49 S.W. 2d 704, 705, holding "The word 'party,' when used in connection with a suit, as being 'one by or against whom a suit is brought; the party stated in the writ on the record'"; and Burns v. Baldwin-Doherty Co., 132 Me. 331, 170 A. 511, and The Adah, 2 Cir., 258 F. 377, both declaring that parties are all persons having right to control proceedings, to make defense, to adduce and cross-examine witnesses, and appeal from decision, if appeal lies. In State v. Tri-State Telephone Co., 146 Minn. 247, 178 N.W. 603, it was held that inviting a city in which a telephone company maintained an exchange to attend a hearing in a rate proceeding did not make it a party permitting it to file objections to the rates in effect and to participate in the proceedings before the commission. An amicus curiae is not a party to a proceeding. Jones v. Cashin, 133 Miss. 585, 98 So. 98. "The term 'parties' includes all persons who are directly interested in the subject-matter in issue, who have a right to make a defense, control the proceedings, or appeal from the judgment. Strangers to the suit are persons who do not possess these rights". Burrell v. United States, 9 Cir., 147 F. 44, 46.

39 American Jurisprudence, at page 851 declares: "The term 'parties' is a technical word which has a precise meaning in legal parlance. It designates the opposing litigants in a judicial proceeding—the persons seeking to establish a right and those upon whom it is sought to impose a corresponding duty or liability; it includes all the persons by whom or against whom a suit, either at law or in equity is brought. * * * Although in its broader respects the term 'parties' includes all who are directly interested in the subject matter of suit or some part thereof or who have a right to make defense, control the proceedings, examine and cross-examine witnesses, and appeal from the judgment rendered, it is ordinarily used to designate only those who are named as such in the record and are properly served with process or enter their appearance. When a statute speaks of a party it refers to a party to the record, a plaintiff or a defendant, and generally those who are not named as such in the record are not properly regarded as parties and may not avail themselves of rights given to parties. * * *"

In 47 Corpus Juris, at page 14 et seq. it is said: "With reference to judicial proceedings, the word 'party' is generally used as meaning one of two opposing litigants. * * * The words 'party' and 'parties' when used with reference to suits or actions, are technical words of precise meaning unless it is apparent that they are used in a more popular sense. * * * The term 'parties' means the person whose name is expressly mentioned in the record as plaintiff or defendant, and refers only to those who are parties named in the record. One who is not named is not a party, although he may be interested."

"* * * A person named in the record as a party is not in fact a party to the action unless he has been duly brought in by legal process, or has voluntarily appeared and submitted himself to the jurisdiction. * * * The phrase 'a party to the proceeding' in its ordinary legal meaning embraces such persons as are parties in a legal sense, and who have been made or become such in some mode prescribed by law, so that they are bound by the proceedings."

The Rules of Practice of the Interstate Commerce Commission make it clear that the word "petition" as the statute uses it means a written application. The Commission prescribes rules of practice to govern all proceedings before it and these rules do not make any provision for the institution of any proceedings or the issue of any order on oral request. They affirmatively require all petitions to be in writing. Commission Rule 5, effective under the revision of September 14, 1942, provides: "Definitions as used in those rules—(d) The term 'pleading' means a complaint, answer, reply, application, protest, motion (other than motion orally made at hearing or argument), petition, etc."

Rules 15, 16, 17, 24 and 26 all provide for written complaints, pleadings, etc. Those in effect for a number of years prior to the September 15th revision were substantially the same. But this is not all. The Interstate Commerce Act itself shows conclusively that the word "petition" means a written instrument, and the word "party" a litigant of record. At the time of the passage of the venue act in question here, the word "petition" appeared in the Interstate Commerce Act in six different sections or subsections, four dealing with proceedings before the commission and making clear beyond question what is meant by the words "petition of any party" in

the venue Act,[3] and two with a petition in court.[4]

Finally, when the prime purpose of the venue statute to give local venue, first to the complaining party of record in the proceeding before the commission, and, second, if there is no such formal party, to the complaining party in the suit in court, is considered, it is quite clear that if the view of the majority prevails, the whole purpose of the statute to confer local venue in the interest of justice and for the convenience of parties litigant[5] will be defeated.

Because I think it is clear beyond question that the order in this case was not made "upon the petition of any party," and the venue in this case is in this district where the plaintiff has either its office or its principal operating office,[6] I do not find it necessary to consider plaintiff's alternative claim that the orders of January 27, and February 9, 1943, rejecting its petitions for special permits give jurisdiction here. Believing that this court has jurisdiction, and should exercise it, I respectfully dissent from the dismissal of plaintiff's petition.

[3] 49 U.S.C.A. § 12(4) "The testimony of any witness may be taken, at the instance of a party, in any proceeding or investigation pending [depending] before the commission, by deposition, at any time after a cause or proceeding is at issue on *petition* and answer."

49 U.S.C.A. § 13(1): "Any person, firm, corporation, company, or association, or any mercantile, agricultural, or manufacturing society, or other organization, or any body politic or municipal organization, or any common carrier complaining of anything done or omitted to be done by any common carrier subject to the provisions of this chapter in contravention of the provisions thereof, may apply to said commission by *petition*, which shall briefly state the facts; whereupon a statement of the complaint thus made shall be forwarded by the commission to such common carrier, who shall be called upon to satisfy the complaint, or to answer the same in writing, within a reasonable time, to be specified by the commission."

49 U.S.C.A. § 13(2); "And the said commission shall have the same powers and authority to proceed with any inquiry instituted on its motion as though it had been appealed to by complaint or

*petition* under any of the provisions of this chapter, * * * ."

49 U.S.C.A. § 13(3): "Whenever in any investigation under the provisions of this chapter, or in any investigation instituted upon *petition* of the carrier concerned * * * ." (Emphasis supplied.)

[4] 49 U.S.C.A. § 16(2): "If a carrier does not comply with an order for the payment of money * * * , the complainant * * * may file * * * a *petition* setting forth briefly the causes for which he claims damages, and the order of the commission in the premises."

49 U.S.C.A. § 16(3) (f): "A *petition* for the enforcement of an order of the commission for the payment of money shall be filed in the district court or the State court within one year from the date of the order, and not after." (Emphasis supplied.)

[5] Vicksburg S. & P. R. Co. v. Anderson, 256 U.S. 408, 41 S.Ct. 524, 65 L.Ed. 1020; Kansas City Southern v. United States, 282 U.S. 760, 51 S.Ct. 304, 75 L. Ed. 684.

[6] Alaska Steamship Co. v. United States, D.C., 259 F. 713; Isbrandtsen-Moller Co. v. United States, D.C., 14 F. Supp. 407.